[Civ. No. 13724.   First Dist., Div. One.   Sept. 28, 1948.]

ROBERT ARNOLD HUNTER, Respondent, v. MAURICE C. SPARLING, as State Superintendent of Banks, etc., Appellant.

Shirley, Saroyan, Shearer & Sullivan and S. M. Saroyan for Appellant.

Cushing, Cullinan, Trowbridge, Duniway & Gorrill, Delger Trowbridge and John H. Murray for Respondent.

PETERS, P. J.—Plaintiff brought this action against the state superintendent of banks acting as liquidator of the Yokohama Specie Bank, Ltd., to recover from the bank the sum of $20,835.50 allegedly due from the bank to plaintiff as the balance due on his retirement allowance. From a judgment in favor of plaintiff defendant appeals.

It is admitted that plaintiff worked for the bank, located in San Francisco, from 1892 to 1941; that in November of 1941, plaintiff contemplated retiring from his employment; that at that time plaintiff was informed, in writing, that the bank would pay him, as a retirement payment, $35,535.50, plus $5,300 for certain expenses hereafter described; that, had the plaintiff so desired, the bank would have paid him the full sum on November 28, 1941, but that on that date, at plaintiff's request, the bank paid him but $20,000, promising to pay the balance of $20,835.50 in February, 1942. This was done in order that the payments would be made in two years and would thus, according to the belief of plaintiff, reduce the amount of the federal income tax payable on the transaction. After the $20,000 had been paid, the war intervened and the bank was taken over by the alien property custodian and the state superintendent of banks and ultimately placed on the latter's hands as liquidator. Plaintiff filed a claim with the liquidator for the balance claimed to be due within the

time and in the manner provided by law, and, upon its rejection, instituted this suit.

The basic problem involved in this litigation is whether the promise of the bank to pay the balance of $20,835.50 is legally enforceable, or whether it was a mere unenforceable promise to make a gift.

The complaint alleges that the bank is a foreign corporation organized under the laws of Japan, with its principal place of business in San Francisco; that on December 8, 1941, the then state superintendent of banks took possession of the business and property of the bank and placed the bank in conservatorship; that on March 13, 1945, the then superintendent of banks became liquidator of the bank; that plaintiff was employed by the bank in San Francisco from November 2, 1892, to November 28, 1941; that for 27 years prior to 1941 the bank had rules and regulations providing for the payment of pensions or allowances to its employees in its San Francisco office upon retirement, and that plaintiff had knowledge of such rules and regulations; that plaintiff's knowledge of the existence of such rules and regulations was one of the principal reasons and inducements why plaintiff continued in the employ of the bank after securing such knowledge; that plaintiff was retired by the bank on November 28, 1941; that on that day the bank executed and delivered to plaintiff, in consideration of his long services and pursuant to its rules and regulations, its check for $20,000 and a certain writing which is attached to the complaint as an exhibit; that the payment of $20,000 was a partial payment on account of the sum of $40,835.50 referred to in the exhibit; that in said exhibit the bank agreed to pay the balance of $20,835.50 in February, 1942.

During the trial the due execution and delivery of this exhibit by the bank was admitted by defendant. It is in the form of a letter on the letterhead of the San Francisco bank and is dated November 28, 1941. It is signed:

"THE YOKOHAMA SPECIE BANK, LTD.
/s/ M. Motoyoshi
Manager."

In it the manager first praises plaintiff, in the most laudatory language, for his many years of faithful services to the bank. The letter then continues as follows:

"At this time, it is my very greatest pleasure to present you with a Cashier's Check for $20,000.00, a partial payment of the $40,835.50, which I have been instructed by the Presi-

dent['s] Office in Tokyo to pay to you as a retiring allowance from this Bank, particulars as noted hereunder.

"In this connection, I wish to convey to you the good will of the Board of Directors, whose intention it was to offer you an invitation to visit Japan in appreciation of the fathomless services and your untiring efforts rendered to this Bank. Unfortunately, this plan being impossible due to the present unsettled situation, they have decided to offer you $2,000.00 in cash in lieu of the Travel you were to be bestowed. Moreover, they took into consideration with deep sympathy, the problem of the heavy taxes that will be incurred in presenting this gratuity and have added a subsidiary sum of $3,300.00 to defray the expenses of taxes. These two amounts are to be considered as merely an extra presentation aside from the gratuity ordinarily calculated in accordance to the rules and regulations of this Bank. It has been specially called to my attention that such subsidiary gratuity is an unprecedented case, and that the remainder of the gratuity proper shall be presented to you in February of 1942.

```
Gratuity ............. $35,535.50
Travelling Expense ...   2,000.00
Tax Subsidy ..........   3,300.00
                       _____
                       $40,835.50
Less [check enclosed] ... 20,000.00
                       _____
Remainder ........... $20,835.50  (February 1942)"
```

The complaint further alleges that in November, 1941, the bank's books showed the "sum of $40,835.50 as money so to be paid to the plaintiff, and showing the payment of the sum of $20,000 as the first payment on account thereof." Attached to the complaint is an exhibit purporting to support this allegation.

At the trial it developed that the only entry on the books of the company purporting to show a $40,835.50 indebtedness to plaintiff was this exhibit—a document entitled "Transfer Voucher." It was in the form of a printed slip kept by the clerk for the purpose of accounting for money paid out by him. It shows a $20,000 payment and recites that this was the "First payment of Robert Arnold Hunter, Retirement Pension for $40,835.50."

The complaint further alleges that on October 10, 1941, the bank prepared and filed with the Secretary of the Treasury an application for a license to pay to the plaintiff

the sum of $40,835.50, of which $20,000 was to be paid at once and the balance three months thereafter, and that on November 25, 1941, the Federal Reserve Bank of San Francisco, by direction of the Secretary of the Treasury, issued its license to the bank.. It is admitted that such application and license were necessary under federal executive orders requiring permission for any banks in which Japan had an interest to pay out money. The application is on a form supplied by the treasury department and contains certain formal information. It is signed by the "Sub Manager" of the bank. Under the printed statement "The applicant desires a license in order to : (State in detail the nature, purpose and amount of the transaction ...)" appears the following in typewriting admittedly inserted by the bank:

"Mr. Robert Arnold Hunter, a citizen of the United States, entered our employment on November 2, 1892 and since then he has been continuously employed by this Bank. (Approximately 49 years)

"Mr. Robert Arnold Hunter has expressed his desire to retire and has proposed to be relieved of his duty from this Bank.

"The Bank desires to compensate Mr. Robert Arnold Hunter for his long service to this Bank as set forth in our retirement regulations by paying the sum of $40,835.50 to him as a retiring pension, of which it is proposed to pay the sum of $20,000—in October, 1941 and the balance of $20,835.50 three months thereafter, that is in January, 1942.

"We, therefore, desire to apply for a Special License for said amount so that we may hand same to Mr. Robert Arnold Hunter.

"We shall charge the above-mentioned amount to our Profit and Loss Account and issue our Cashier's Checks in favor of Mr. Robert Arnold Hunter, as specified above."

The license issued by the Federal Reserve Bank of San Francisco under the authority of the Secretary of the Treasury authorized the bank to : "Charge not to exceed the total sum of $40,835.50 to your profit and loss account and pay a like total amount (in two installments) by cashier's checks to Robert Arnold Hunter (U. S. citizen) as a retirement pension accruing from his services extending over nearly half a century as an employee of your bank."

Defendant's demurrer was overruled, and thereupon he filed an answer and cross-complaint. By the cross-complaint

defendant sought to recover the $20,000 admittedly paid to plaintiff on November 28, 1941, on the theory that it was paid without authority. No evidence was introduced to support these allegations, and the cross-complaint was dismissed by stipulation during the trial.

The answer of defendant denies, on information and belief, that plaintiff for 27 years, or any other period, had any knowledge of the rules and regulations of the bank providing for the payment of a retirement allowance; denies that the existence of such rules or regulations induced plaintiff to remain in the employ of the bank; alleges that any rules and regulations relating to retirement were under the control of the home office in Japan and had no relation to the San Francisco branch of the bank; alleges that the $2,000 traveling allowance and the $3,300 tax subsidy were no part of the rules and regulations of the bank; admits the payment to plaintiff of $20,000, but alleges that such payment was made for the account of the home office and was charged to that office; that the obligation, if any, to pay the balance of $20,-835.50 was the obligation of the Tokyo office of said bank and not of the San Francisco office; denies that any account was ever set up on the books of the bank showing an indebtedness to plaintiff of $40,835.50, or a balance of $20,835.50; alleges that the retirement rules and regulations did not form any part of plaintiff's contract of employment; alleges that the promise of the bank to pay plaintiff a retirement allowance was wholly without, and unsupported by, consideration and constituted a mere promise to make a gift.

In his opening statement counsel for plaintiff stated that he was proceeding on two theories—express contract, and an account stated. During the trial the judge indicated, in no uncertain fashion, that, in his opinion, the promise of the bank did not create a contract.[1] The court did indicate how-

---

[1]Some of these comments are as follows:

(R.T. 80) "THE COURT: There has been no testimony in the record so far that this plaintiff or any of the employees had an enforceable contract with the bank that upon retirement they would get this amount of money."

(R.T. 90) "THE COURT: There is no legal liability to pay this; it was more or less of a donation for faithful service."

(R.T. 198) "THE COURT: I take it the only difficulty was they gave him the total and he only took half and left the balance of the money in trust. Now, if he cannot win on that theory, he can't win. There was no obligation on them to pay him.

"MR. SAROYAN: In other words, your Honor's position in this case

ever, that, in its opinion, the evidence might support the theory of a completed gift based upon consideration with delivery of the $20,000, and an express trust created for the balance. After the judge had indicated his thoughts on this subject, plaintiff was recalled to the stand and testified that prior to his retirement he discussed the question of the amount of the allowance and the method of its payment with Motoyoshi, the manager of the San Francisco branch. He testified that he requested that the allowance be paid to him in two payments, one in 1941 and one in 1942, in order to avoid too heavy an income tax; that Motoyoshi ''agreed with the request and he gave instructions to make the first payment of $20,000, which he did, and agreed that the balance would be held for my account and paid in February of 1942.''[2] Based on this testimony plaintiff was permitted to amend his complaint to conform to the proof. This amendment is as follows: ''Before and at the time of delivery of said writing [the letter of November 28, 1941—Exhibit 'A' to complaint] it was agreed between the plaintiff and said bank that the sum of $40,835.50 was then and there due and payable to plaintiff in cash. Said bank paid said plaintiff the sum of $20,000 in cash at said time and agreed, at the special instance and request of plaintiff, to hold thereafter the balance of $20,835.50 for plaintiff, as trustee for him, and to pay him said balance some time during the month of February, 1942.''

The evidence was not in substantial conflict and, in general, supported the facts as alleged in the complaint. In addition to

---

is that there was a completed gift and a trust account set up?

''THE COURT: Yes.

''MR. SAROYAN: There isn't any evidence a trust account was set up.

''THE COURT: The circumstances show that.''

(R.T. 201) ''THE COURT: I wouldn't say there was no consideration as to a completed gift, he certainly had no contract he could sue under. Assuming he could sue for this gratuity, I don't believe he could recover unless the money was given to him. . . .''

[2]There is some other testimony on this issue developed on the cross-examination of plaintiff. After admitting that the only written evidence of the transaction that he received was the $20,000 check and the letter of November 28, 1941, he was asked if he had any discussion with Motoyoshi ''in respect to setting up an account or a deposit at the bank.'' He replied: ''I simply requested, as I have testified before, payment of the $20,000 and the balance to be held for my account, to be paid in February . . . he agreed to comply with my request.'' It was then stipulated that the transfer voucher, the license application, the license, and the letter of November 28, 1941, were the only written evidences of the transaction, and that no special account was set up for the balance owing.

what has already been said about the evidence, the record shows that plaintiff first learned that the San Francisco bank had a retirement plan "Some years before 1918," and it was particularly called to his attention in that year when one of his fellow employees retired and received a flat sum allowance. Thereafter, several other employees retired and were similarly treated, and plaintiff knew it. The record also shows that from 1918 to 1941 the plaintiff discussed the question of retirement allowances at various times with the various managers and sub-managers of the bank and from them learned most of the basic provisions of the plan. It was common knowledge among the employees of the bank that such a plan existed. The plaintiff also testified that after he learned that the bank had such a plan he received certain offers of employment from other banks but turned them down and remained in the employ of the Yokohama Specie Bank because he felt that it would be to his advantage to so remain in view of the retirement plan available to him. He admitted that he did not learn the exact formula that was used by the bank until 1940, but prior to then he was told that he would get a "substantial," or a "large" sum of money in a "lump sum." He was told the details of the actual formula in 1940, but did not know until 1941 what base pay was to be used when applying the formula. The bank had printed rules and regulations formulated by the home office applicable to retirement of its employees, but they were written in Japanese and plaintiff was unable to read Japanese. Various letters between the San Francisco and home office relating to Hunter's allowance were introduced. In one of them the home office computed the allowance at $35,535.50 and referred to it as "Retirement pension according to the regulation."

On these facts, most of which are not in dispute, findings were made that are repetitious and, in some respects, inconsistent. The exact theory upon which they are based is somewhat difficult to ascertain. The court found the facts in reference to plaintiff's employment and then found that for 23 years prior to 1941 the bank had rules and regulations, not published in writing but known to the employees, relating to the payment of retirement allowances to its employees, and that, during such period, such rules and regulations were systematically followed and carried out by the bank; that during such period plaintiff knew of these rules and regulations, they having been communicated to plaintiff by officers of the bank;

that the existence of such rules was one of the reasons why plaintiff continued in the employ of the bank from 1918 to November 28, 1941. These findings are amply supported by the evidence.

The court then found that plaintiff was retired on November 28, 1941, and that on that date the bank executed and delivered to plaintiff the letter heretofore discussed; that ''Before and at the time of delivery of said writing it was agreed between the plaintiff and said bank that the sum of $40,835.50 was then and there payable as a retirement pension or allowance to plaintiff in cash pursuant to said rules, regulations and long continued custom. Said bank paid said plaintiff the sum of $20,000 in cash at said time and agreed, at the special instance and request of plaintiff, to hold thereafter the balance of $20,835.50 for plaintiff and to pay him said balance some time during the month of February, 1942.'' These findings were in support of the trial court's theory of a completed gift, partial delivery, and a declaration of trust as to the balance.

The court then found the facts in reference to the transfer voucher; found, in accordance with the evidence, that such vouchers were always countersigned by a manager of the bank and were preserved and recognized as the original entries of the transactions described therein. The facts in reference to the application for and issuance of the license and the filing of the claim are then found by the court. It is then found that no part of the sum of $20,835.50 has been paid, and that said sum, plus interest, is owing to plaintiff, and that, while the rules and regulations pertaining to retirement were under the control and management of the home office of the bank, such rules and regulations did have application to the employees of the San Francisco branch of the bank.

The court then found that the $2,000 traveling allowance and the $3,300 tax subsidy were gifts that were fully executed on November 26, 1941, and that said gifts were supported by consideration—i. e., plaintiff's long and faithful and continuous service to the bank, which service, in part, was rendered in reliance on securing a paid trip to Japan and in having the bank assume the income tax burden, and that the rules and regulations of the bank did not prohibit such payments. The next finding is to the effect that it is not true that the payment of the $20,000 and the obligation to pay the $20,-835.50 were obligations of the Tokyo office of the bank, but

that it is true that such obligations were the obligations of the San Francisco office of the bank.

The court then makes a repetitious finding that one of the reasons why plaintiff remained in the employ of the bank was his knowledge of the existence of the rules and regulations of the bank relating to retirement, and the assurances given him by the managers of the San Francisco bank that, upon his retirement, he would receive a substantial lump sum as a retirement allowance. The court then, in view of its findings on consideration, makes this somewhat inconsistent finding: "It is true that the rules and regulations of The Yokohama Specie Bank, Ltd., if any, with respect to retirement pay or allowance form no part of the contract of employment between said bank and the plaintiff, provided, however, that a legal liability arose in favor of the plaintiff on or about November 28, 1941, and against said bank for the amount due the plaintiff as herein determined by reason of all the facts found in these findings of fact.

"It is not true that any promise or agreement made by the Yokohama Specie Bank, Ltd., San Francisco office, or any officer thereof, to pay the retirement allowance set forth in the complaint on file herein, or any part thereof, was wholly or in any part without any consideration whatsoever and wholly or wholly outside and beyond or beyond the power and authority, or authority, of said office or any officer of said bank, but on the contrary the payment of the $20,000 of said retirement allowance on November 26, 1941 and the promise made at the same time to pay the balance thereof, amounting to $20,835.50 in February, 1942, were supported by fully adequate and valid consideration and were entirely within the power and authority of the San Francisco office and officers, and each of them, of said bank."

The court then again finds that the obligation involved was not that of the Tokyo office of the bank, but was that of the San Francisco office, finds against certain defenses of defendant, and then provides in its conclusions of law that: "at no time was there any contract for the payment of a retirement allowance by and between the Yokohama Specie Bank, Ltd., San Francisco office, and plaintiff, sufficient to amount to or to support an account stated"; that when the $20,000 was delivered to plaintiff "there was a completed and executed gift from said bank to plaintiff in the sum of $40,835.50; that the balance of said gift not paid to plaintiff on said 26th day

of November, 1941, to wit: the sum of $20,835.50, was retained by said bank in trust and for the benefit of plaintiff herein, and said bank promised and agreed to hold said balance for the account of said plaintiff and to pay the same in full to him during the month of February, 1942.''

The pleadings, evidence, findings and conclusions have thus been summarized at some length in order to show that most of the basic facts were not in dispute and were found in favor of the plaintiff. From those basic facts the question is presented, is plaintiff entitled to recover the sum of $20,835.50, plus interest, from the defendant? That is a question of law and not of fact. ■ The question as to whether, from the facts found, there was a contract, or a completed gift with partial delivery and an express trust as to the balance, or any other legally enforceable obligation, is a question of law and not of fact. For that reason the ''finding'' that the rules and regulations relating to retirement formed no part of plaintiff's contract of employment is not a finding of fact at all, but a misplaced conclusion of law, not supported by the facts found, which facts are practically undisputed. The rule applicable to such a situation is well settled. Where a conclusion of law is not supported by the facts found, the conclusion of law must be disregarded. (*Falk* v. *Falk,* 48 Cal.App.2d 762 [120 P.2d 714]; *Schoolcraft* v. *B. O. Kendall Co.,* 108 Cal.App. 546 [291 P. 659]; *McKay* v. *Gesford,* 163 Cal. 243 [124 P. 1016, Ann.Cas. 1913E 1253, 41 L.R.A.N.S. 303].) That rule has peculiar application to the problem here presented. The facts here are not substantially in dispute. The trial judge was presented with the question as to whether, under those facts, a contract or other legally enforceable obligation arose. He undoubtedly concluded that there was no contract, but that there was another form of legal obligation involved. If, as a matter of law, under the admitted facts, he was wrong as to his conclusion that there was no contract, then the ends of justice will best be served by disregarding that erroneous conclusion and applying the correct law to the admitted facts.

With these principles in mind we turn first to a consideration of the question, as to whether, under the facts, there was an enforceable contract between the bank and the plaintiff to pay to plaintiff the full amount of his retirement allowance. The facts show 49 years of employment. They show that about 1918 plaintiff first learned that he would receive a retirement payment when he retired; that after 10 years of employment

he was entitled to such a payment, and that the payment would be large. Between 1918 and 1941 he talked the matter over with various officers of the bank and learned more about the details of the plan. All during this period the bank had rules and regulations but plaintiff could not read them because they were in Japanese, but plaintiff and other employees knew that such rules existed and knew of their general import. In 1940 one of the officers gave him the formula to compute his allowance, but he misunderstood what salary was to be used as a base. About the end of 1940 he was informed, by one of the officers of the bank, that he would be entitled to about $35,000. It is defendant's main contentions that such facts do not give rise to an enforceable contract because there was no consideration, and second, the contract, if one existed, was too uncertain in its terms to be enforceable.

The point that there was no consideration is clearly without merit. It is well settled in this state that, where the employer has a pension plan and the employee knows of it, continued employment constitutes consideration for the promise to pay the pension. The pension is considered to be deferred compensation. The problem most frequently arises in public pension cases, because, in this state the Constitution prohibits gifts of public money to an individual. (Art. IV, § 31.) It has consistently been held that a public pension is not a gratuity, but, after the services have been performed, is a vested contract right of the employee. The extent to which this rule has been applied in this state is well illustrated by the recent unanimous opinion of the Supreme Court in *Kern* v. *City of Long Beach,* 29 Cal.2d 848 [179 P.2d 799]. In that case it appeared that the city of Long Beach for many years had certain pension provisions for its employees. These were amended during his period of service. As amended, they entitled the employee to a pension after 20 years of service. Thirty-two days before the expiration of the employee's twenty years of service the city purported to repeal its pension provisions. The court held, citing many cases, that the right to a pension was a vested right protected by the contract clause of the federal Constitution. Many cases were referred to holding that where services are rendered under a pension plan the pension payments are in fact deferred compensation. The court then stated (p. 855):

"Insofar as the *time* of vesting is concerned, there is little reason to make a distinction between the periods before and after the pension payments are due. It is true that an employee

does not earn the right to a full pension until he has completed the prescribed period of service, but he has actually earned some pension rights as soon as he has performed substantial services for his employer. (See *Dryden* v. *Board of Pension Commrs.*, 6 Cal.2d 575, 579 [59 P.2d 104] ; *French* v. *French,* 17 Cal.2d 775, 777 [112 P.2d 235].) He is not fully compensated upon receiving his salary payments because, in addition, he has then earned certain pension benefits, the payment of which is to be made at a future date. While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due. Clearly, it cannot do so after all the contingencies have happened, and in our opinion it cannot do so at any time after a contractual duty to make salary payments has arisen, since a part of the compensation which the employee has at that time earned consists of his pension rights . . .

"Accordingly, we conclude that petitioner has a vested pension right and that respondent city, by completely repealing all pension provisions, has attempted to impair its contractual obligations. This it may not constitutionally do, and therefore the repeal is ineffective as to petitioner."

While this precise problem has seldom been considered by the California courts in connection with pension provisions made by private employers, it is the general rule throughout the country that continued service after knowledge of a pension plan, constitutes ample consideration for the employer's promise to pay. The rule, supported by many cases, is thus stated in 56 C.J.S. p. 828, § 169 : "A benefit plan offered by an employer to all its employees and impliedly accepted by them through remaining in the employment constitutes a contract between the employer and employee, the service rendered by the employee being a sufficient consideration to support the employer's promise to pay benefits. In such case the plan is not a mere gratuity or charity conferring on the employees and their dependents no legal rights, and payments of benefits under the plan are not mere gratuities to be awarded in the discretion of the corporate employer's officials."

The only case cited by appellant on this issue that requires special notice is *Russell* v. *Johns-Manville Co.*, 53 Cal.App. 572 [200 P. 668]. In that case the plaintiff was a month-to-month salaried employee. In October, 1918, the employer published a notice to the effect that, in recognition of services rendered, the company would pay, as additional compensation to all salaried employees "who have been in the Company's employ for the calendar year of 1918," a specified bonus. Plaintiff was discharged on November 16, 1918, and sought to recover the promised bonus. A judgment for plaintiff was reversed. The exact theory of the reversal is not clear from the opinion. Much is said about the promised bonus being a "gratuity," and there is no doubt that the appellate court believed that the notice constituted a mere promise to make a gift. This thought, however, is inconsistent with the holding in the City of Long Beach case, *supra*, and out of line with the overwhelming weight of authority. The case has been severely criticized (*Scott* v. *J. F. Duthie & Co.*, 125 Wash. 470 [216 P. 853, 28 A.L.R. 328]), no petition for hearing was requested, it has never been cited with approval, and, on at least two occasions, it has been explained away or distinguished by California courts. (*Redd* v. *Williams Radiator Co.*, 112 Cal.App. 353, 358 [296 P. 676]) (hearing denied); *Sieck* v. *Hall*, 139 Cal.App. 279, 294 [34 P.2d 844].) The case is readily distinguishable from the present one on its facts. In the Russell case the offer was to pay a bonus to those still in the employ on December 31, 1918. That offer could be accepted only by performing the act requested, namely, remaining in the employ until that date. The employee was fired before that date, so the act required was never performed. The unilateral contract never came into existence. But in the instant case the offer was to pay a cash sum, according to a fixed formula, to all employees who remained in the employ of the bank for over 10 years, and voluntarily retired. Plaintiff accepted that offer by remaining in the employ of the bank for 49 years, during 23 of which he had knowledge of the offer.

This point need not be labored further. It is obvious that, under the admitted facts as found by the trial court, there was an offer to contract which was accepted by the performance of the act required, and that the continued service of plaintiff after knowledge of the offer constituted ample consideration to support the contract.

But, says appellant, if a contract existed, it was too uncertain in its terms to be enforceable. This contention is

based upon the admitted fact that plaintiff did not know of the precise formula involved until 1940, and until 1941 was confused as to what base pay was involved in the formula. For 23 years plaintiff knew that there was a formula and knew that, if he remained with the bank, upon retirement he would receive a large cash payment as deferred compensation. The fact that the precise terms of the formula were not known to plaintiff is immaterial as long as such terms were capable of ascertainment by the conduct of the parties or otherwise. (*Allen* v. *Cross,* 66 Cal.App. 130 [225 P. 765]; see Williston on Contracts, vol. 1, § 49, p. 138; *Roy* v. *Salisbury,* 21 Cal.2d 176 [130 P.2d 706].) An offer too uncertain to create a bilateral contract if accepted, may, by performance by the offeree, create a unilateral contract. (12 Am.Jur. p. 554, § 64.)

We therefore conclude that, under the facts found, there was an enforceable contract amply supported by consideration, and that the conclusion of law to the contrary, erroneously placed in the findings, being contrary to the admitted facts, must be disregarded.

■ Our conclusion that there was an enforceable obligation to pay the balance of the retirement allowance need not be predicated solely upon the theory that there was an offer and acceptance and consideration. Even if the promise had been originally intended as a promise to make a gift, under the facts here involved, such promise would be enforceable. The undisputed and found facts show that after plaintiff knew of the promise, he received several offers of employment by other banks and turned them down because, if accepted, he would lose his retirement allowance. The promise was one that was designed to accomplish just that result. Under such circumstances the doctrine of promissory estoppel is applicable. That doctrine is defined as follows in section 90 of the Restatement of Contracts: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

The following illustration is given in the Restatement of a proper application of the section: "A promises B to pay him an annuity during B's life. B thereupon resigns a profitable employment, as A expected that he might. B receives the annuity for some years, in the meantime becoming disqualified from

again obtaining good employment. A's promise is binding." (See, also, Pomeroy's Equity Jurisprudence, 5th ed., vol. III, § 808b, p. 211.) The rule is followed in California. (*Burlingame* v. *Rowland,* 77 Cal. 315 [19 P. 526, 1 L.R.A. 829]; *Kinsell* v. *Thomas,* 18 Cal.App. 683 [124 P. 220]; *Churchill* v. *Russell,* 148 Cal. 1 [82 P. 440]; *Carpy* v. *Dowdell,* 115 Cal. 677 [47 P. 695]; *Seymour* v. *Oelrichs,* 156 Cal. 782 [106 P. 88, 134 Am.St.Rep. 154]; *Wilk* v. *Vencill,* 30 Cal.2d 104 [180 P.2d 351].) This constitutes an alternative ground for holding that there was a legally enforceable obligation to pay the balance of the retirement allowance. This conclusion makes it unnecessary to determine whether there was an account stated, an open book account, or a trust, three other theories relied upon by plaintiff.

The only other major contention of defendant is that the obligation to pay the balance, if an obligation existed, was that of the home office in Japan and not that of the San Francisco branch, and that, under section 7 of the California Bank Act (1 Deering's Cal. Gen. Laws, Act 652), the liquidator is prohibited from paying the debt out of the assets of the San Francisco bank. This same contention was urged in the trial court, and the court found contrary to it. Defendant admits that section 7 has no application if the obligation was that of the San Francisco bank.

The defendant argues that the regulations relating to retirement came from the home office; that the orders for retirement payments came from that office; that the books show that the $20,000 that was paid was charged to the "profit and loss" account, and from there carried into the "inter-office" or "president's" account, and so became a charge against the home office; that the books show that the assets of the San Francisco office were not charged with the $20,000 payment. It is true that the $20,000 payment was charged against the "profit and loss" account, but so were other expenses of the local bank. All expenses of the local bank reduced the profit ultimately sent to Japan. The real question is not what the books show, but where did the obligation arise, and where and from what assets was plaintiff entitled to be paid? While the regulations pertaining to retirement were framed by the managing officers in Japan, the substance of such regulations was communicated to plaintiff in San Francisco by managers and sub-managers of the San Francisco bank. The regulations were applicable to employees in the San Francisco bank. The services were rendered in San

Francisco for the San Francisco bank, and it was the performance of those services that constituted the acceptance of the offer of a unilateral contract. Thus the contract was entered into in San Francisco, the services were rendered here, and the plaintiff was entitled to payment here from the assets of the San Francisco bank. This payment differed in no way from the normal salary payment due plaintiff. It was deferred compensation, and, as such, was the obligation of the San Francisco bank. The finding and conclusion to this effect are amply supported by the evidence, and are sound in law.

The finding to the effect that the rules and regulations of the bank formed no part of plaintiff's contract of employment is stricken from the findings, and the conclusions of law are amended to provide that such rules and regulations were part of plaintiff's contract of employment, and that, under the facts found, a contract existed, amply supported by consideration, to pay to plaintiff his retirement allowance.

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 22, 1948. Schauer, J., voted for a hearing.