[Civ. No. 61213. Second Dist., Div. Five. Dec. 4, 1981.]

*HANNON ENGINEERING, INC., et al., Plaintiffs, Cross-defendants and Appellants, v.
ROBERT REIM et al., Defendants, Cross-complainants and Appellants.

*Reporter's Note: This case was previously entitled "Hannon Engineering, Inc. v. Strom Industries, Inc."

Counsel

Booth, Mitchel, Strange & Smith, Michael T. Lowe, Robert P. Fry, Jr., and Timothy Lea Joens for Plaintiffs, Cross-defendants and Appellants.

Bodkin, McCarthy, Sargent & Smith and Timothy J. Sargent for Defendants, Cross-complainants and Appellants.

## Opinion

**RALPH, J.\***—Hannon Engineering, Inc., Andrew Hannon and Patrick Hannon, plaintiffs and cross-defendants (hereinafter referred to as *cross-defendants*) appeal from a judgment entered February 26, 1980, awarding compensatory and punitive damages to defendants and cross-complainants, Robert Reim (Reim) and Andrew Ferreghy (Ferreghy) (hereinafter referred to as *cross-complainants*). Cross-defendants request that the award of punitive and compensatory damages be vacated and the judgment modified to reflect only the amount of vested profit sharing plan benefits plus the interest accrued thereon, contending (1) that the actions alleged in the cross-complaint are controlled by the Employee Retirement Income Security Act (ERISA) of 1974, and/or (2) that cross-complainants have failed to plead or prove a breach of the implied covenant of good faith and fair dealing.

Cross-complainants Reim and Ferreghy contend in their cross-appeal that the amount of punitive damages is inadequate, occasioned by error of the court below in evidentiary rulings and jury instructions involving punitive damages.

We disagree with both and affirm the judgment in all respects.

### Factual Background

On September 26, 1962, cross-complainants, employees of corporate cross-defendant Hannon Engineering, Inc., became eligible to participate in a profit sharing plan (hereinafter the Plan) funded solely by the corporate cross-defendant, no contributions being required from employees. Each year, a portion of the company's contribution was allocated to their respective accounts in accord with the terms of the Plan which provides that 10 percent of participant's interest shall vest on "each Anniversary Date on which he is a Participant following the Anniversary Date on which he becomes a Participant for the first ten (10) years of participation."

Also, article V, section 5.3, of the Plan provides that: "When a Participant ceases to participate, the Committee shall *with reasonable*

---

*Assigned by the Chairperson of the Judicial Council.

*promptness* determine in its discretion *the manner and the time or times of payment of his vested interest* to commence not later than his normal retirement date, . . . which it deems to be in the best interests of the Participant and shall thereupon authorize the Trustee to distribute his interest either in a lump sum or in installments which need not be equal, payable not less frequently than annually for a period not to exceed ten (10) years or by the purchase of an annuity of any type. In the event any plan of payment requires more than one year for completion, the Committee shall direct the Trustee to segregate in a separate account, all of such vested interest which is not to be paid immediately and deposit it in an interest bearing savings account of any bank, including the Trustee's own banking department; any interest received thereon shall be distributed with the final installment of benefits." (Italics added.)

The Bank of America agreed to serve as trustee under the Plan; and in 1974 the benefits committee (Committee) was composed of cross-defendants Andrew Hannon and Patrick Hannon and Harry Alpert (their accountant) and some time in 1974 Andrew Hannon's son-in-law, Mike Ammerman, became a member of the Committee.

Cross-complainant Reim commenced working for Hannon Engineering, Inc., in 1959 and except for a two-year interval (between 1963 - 1965) had never worked for any one else. Cross-complainant Ferreghy started employment with Hannon Engineering, Inc., in 1965.

Between 1962 and 1973, either by letter or by oral communications, cross-complainants were notified that if they left the company before retirement that each would receive 10 percent of the amount in the account for each year each employee had been a participant and that this would be paid either by a cash lump sum or installment payments over a reasonable length of time not to exceed 10 years, to commence not later than normal retirement start date. Prior to 1974, excepting one person, every employee who withdrew from employment with Hannon Engineering, Inc. was paid his/her full amount of vested benefits under the Plan.

Between 1970 and 1973, Reim and Andrew Hannon and Patrick Hannon had conversations regarding initiating company changes which would permit more "employee participation." In November 1973, Reim concluded that no such employee participation would occur, and after

weighing the alternatives, he, along with cross-complainant Ferreghy and two other Hannon employees, set up a "paper corporation." The original date planned by cross-complainants for resignation, February or March 1974, was postponed because of the illness of Patrick Hannon.

Resignations by both cross-complainants were made orally and in writing in March or April 1974 and each written resignation contained a request for payment of the amount of vested interest in the profit sharing fund in one full payment.

In July 1974, both cross-complainants received a letter from the corporate cross-defendant indicating the vested interest had been deposited in a separate interest bearing savings account with the trustee of Bank of America.

According to Andrew Hannon, the reason the Committee did not distribute to Reim and Ferreghy their vested benefits was "we really couldn't decide what was best, except we decided we will put it in their name and defer a decision because we didn't know what was best."

The money has not yet been turned over to cross-complainants.

When cross-complainants resigned, Hannon was informed of the new business formed by cross-complainants and he told them not to take any customers belonging to Hannon Engineering and that he (Andrew) would be watching them. Also, when Reim and Ferreghy left Hannon Engineering, Andrew Hannon examined their personal belongings and accused Reim of stealing catalogues which were later found. These acts, coupled with the knowledge of company policies, (for example, no business calls at home, all mail at the office was opened personally by Andrew Hannon, and the realization that insistence on the pension benefits would result in a lawsuit, which they did not think they could afford), were reasons no further demands for the money were made in 1974 by cross-complainants.

In January 1975, cross-defendants filed a complaint against cross-complainants (and others, not now before this court) for conspiracy to defraud, unfair competition, and breach of confidential relations. Cross-complainants then brought this action alleging that the individual cross-defendants and Hannon Engineering conspired unreasonably and

in bad faith to withhold the pension and profit sharing benefits due them at the time of their resignations.

Both cross-complainants borrowed money from their fathers to commence their new company, relying on the receipt of their vested benefits. Their failure to receive the money handicapped the growth of the company and repayment of the borrowed money, as planned. Their financial problems with the business contributed to personal and family stress.

The complaint and cross-complaint were bifurcated and tried separately. The June 16, 1977, trial on the complaint resulted in a decision in favor of cross-complainants.

On December 13, 1979, the trial on cross-complaint before a jury resulted in a verdict awarding each cross-complainant his vested benefits in the profit sharing plan of Hannon Engineering, Inc.: $21,032.51, compensatory damages for cross-complainant Reim; $18,672.48, compensatory damages for cross-complainant Ferreghy; and $7,000, punitive damages for each cross-complainant.

Appeal and cross-appeal followed entry of judgment on February 26, 1980.

CROSS-DEFENDANTS' APPEAL

Issue 1

*Whether the Employee Retirement Income Security Act of 1974 Preempts the Application of California Law to Cross-complainants' Action to Compel Payment of Profit Sharing Plan Benefit*

Cross-defendants contend that cross-complainants' cause of action accrued after January 1, 1975, and is therefore controlled by the Employee Retirement Income Security Act (ERISA) of 1974, which became effective January 1, 1975.

Section 514, subdivision (a), of the ERISA of 1974 (29 U.S.C. § 1144(a)) provides, inter alia: "Except as provided in subsection (b) of

this section, the provisions of this title ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) ... and not exempt under section 1003(b)...."

And, section 514, subdivision (b), thereof states: "This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975."

The crucial and initial inquiry is: When did the cause of action accrue?

According to cross-defendants' theory, the Plan gives the Committee discretion to decide the manner of payment. Further, since the Plan provides in one of the possible payment plans that the first payment must be made within one year of eligibility, benefits could commence "properly" at any time up to July 1975. They conclude that the cause of action did not accrue until 1975 under federal or state law.

Cross-defendants' position ignores the clear language of the Plan which mandates that "When a Participant ceases to participate, the Committee shall *with reasonable promptness determine* in its discretion the manner and the time ... of payment." (Italics added.)

Also, cross-defendants overlook Andrew Hannon's testimony that "we really couldn't decide what was best, except we decided we will put it in their name and *defer a decision* ...." (Italics added.) "Deferring a decision" is *not* "making a determination with reasonable promptness" and in itself, without more, violates the language of the Plan. Hannon's letter of July 1, 1974, containing the "no-decision" decision is not a "suspension of benefits." Cross-complainants knew when the letters of July 1, 1974, were received, that in order to obtain their benefits it would be necessary to litigate, which they wished to avoid. A denial does not have to be express and overt to be effective. The "deferred decision" letter was a denial of the requests for benefits. The cause of action, therefore, accrued July 1974.

It is not, therefore, necessary, for us to inquire further into the coverage of ERISA, as the cause of action is excluded by section 514, subdivision (b), *supra*, of ERISA, because it arose prior to January 1, 1975.

### Issue 2

■ *Whether Cross-complainants Have Pleaded and Proved
a Breach of Covenant of Good Faith and
Fair Dealing*

The Plan herein, although designated a profit sharing plan and trust agreement, is by its terms an employer-sponsored pension or retirement plan.

■ A pension plan offered by the employer and impliedly accepted by the employee by remaining in employment constitutes a contract between them, whether the plan is a public or private one, and whether or not the employee is to contribute funds to the pension. (*Taylor v. General Tel. Co. of Cal.* (1971) 20 Cal.App.3d 70, 74 [97 Cal.Rptr. 349]; citing *Hunter* v. *Sparling* (1948) 87 Cal.App.2d 711, 722-723 [197 P.2d 807].) The continued employment constitutes consideration for the promise to pay the pension, which is deemed deferred compensation. (*Hunter* v. *Sparling* (1948) *supra*, p. 727.)

■ Pension plans create a trust relationship between pensioner-beneficiaries and the trustees of pension funds who administer retirement benefits (*Lix* v. *Edwards* (1978) 82 Cal.App.3d 573, 578 [147 Cal. Rptr. 295]) and the trustees must exercise their *fiduciary trust* in good faith and must deal fairly with the pensioner-beneficiaries. (*Id.*)

■ The Plan provides, inter alia: "The Committee, on behalf of the Participants and their beneficiaries, shall enforce the Plan in accordance with its terms, shall be charged with the general administration of the Plan, and shall have all powers necessary to accomplish these purposes, including but not by way of limitation, the following: (b) To compute and certify to the Trustee the amount and kind of benefits payable to Participants . . . ."

The Committee members, by accepting the appointment, became voluntary trustees for the beneficiaries of the Plan, as defined in Civil Code section 2216,[1] and were thereafter charged with the fiduciary relationship set out in Civil Code section 2228: "In all matters connected

---

[1]Civil Code section 2216 states: "A voluntary trust is an obligation arising out of a personal confidence reposed in, and voluntarily accepted by, one for the benefit of another."

with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind."

Cross-defendants would have us conclude that, despite the fiduciary duty owed cross-complainants no tortious cause of action for breach of implied covenant of good faith and fair dealing can arise because this is not an insurance contract case and that cross-complainants are left to a breach of contract cause of action only.

Cross-defendants overlook the similarity which exists between insurance contracts and profit sharing or pension plans.

An insurance contract is a contract of adhesion, i.e., a contract "between persons not equally situated," (*Young* v. *Metropolitan Life Ins. Co.* (1969) 272 Cal.App.2d 453, 460 [77 Cal.Rptr. 382, 78 Cal.Rptr. 568]), one which is "entirely prepared by one party to the transaction for the acceptance of the other; such a contract, due to the disparity in bargaining power between the draftsman and the second party, must be accepted or rejected by the second party on a 'take it or leave it' basis, without opportunity for bargaining and under such conditions that the 'adherer' cannot obtain the desired product or service save by acquiescing . . . ." (*Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284].)

The Plan was not the product of a term-by-term negotiation between the parties herein. It was *established by* Hannon Engineering, Inc., for the benefit of the company's salaried employees. Once an employee had completed one year of employment, he was "bound" by the terms of the Plan into which he had no input. If he were "discharged because of conviction of, or confession of, fraud or embezzlement, committed in the course of his employment" he forfeited *all* of his interests which had vested at the time of the discharge. The powerlessness of the employee in such a context creates the conditions giving rise to a contract of adhesion.

We do not hold that in each and every contractual arrangement between employer and employee, an implied covenant of good faith and fair dealing arises the breach of which gives rise to a tortious cause of

action. ■ We do hold that where the relationship of employer-employee has "matured into that of pensioner and administrators," then the "courts must be vigilant in protecting the rights of the pensioner against powerful ... administrators" and a fiduciary duty of good faith and fair dealing is owed (*Symington* v. *City of Albany* (1971) 5 Cal.3d 23, 33 [95 Cal.Rptr. 206, 485 P.2d 270]), the breach of which gives rise to a tortious cause of action of the breach of implied covenant of good faith and fair dealing, for which a wronged party may recover all damages proximately caused thereby, including punitive damages in a proper case.

■ In the cross-complaint, the second cause of action alleges: (1) The relationship of employer and employee and the special circumstances of the establishment of the Plan, certain provisions of which create a fiduciary duty owed by cross-defendants to cross-complainants; (2) the breach of that duty by cross-defendants' refusal to honor requests for benefits; (3) damages proximately caused by deprivation of adequate working capital; (4) that the denial of payments was done maliciously; and (5) that Hannon Engineering conspired with individual cross-defendants to deprive cross-complainants of their benefits. The cross-complaint is sufficiently pleaded.

The record, as summarized hereinbefore, shows a fiduciary duty and a breach of that duty which proximately caused damages to cross-complainants.

But, cross-defendants allege that (1) there is no conspiracy as there is no "wrongful act" about which to conspire; and (2) that the corporate cross-defendants could not conspire with the individual cross-defendants.

The wrongful act is "denial of the payments," which constitutes a breach of fiduciary duty owed. We now inquire whether a conspiracy can occur under these circumstances, and conclude that it can.

We do not quarrel with the proposition cited by cross-defendants that "Agents and employees of a corporation cannot conspire with their corporate principal ... where they act in their official capacities ... and not as individuals for their individual advantage." (*Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 72 [35 Cal.Rptr. 652].) Cross-defendants are ignoring the fact that the individual cross-defendants

were functioning in a dual capacity: as officers and directors of the corporate cross-defendant Hannon Engineering and also in their Plan administrator capacities, as outlined in section 5.3 of the Plan, *supra*. Such duality, although physiological schizophrenia, constitutes *two separate legal entities*. These dual roles were recognized expressly by Andrew Hannon during questioning as follows:

"Q. . . . Would it be fair to say this, you have told Pat: 'When we go into the committee we put on different hats now, and we act in the best interests of the committee and of the employees or ex-employees who are in that profit sharing plan'?

"A. That is right." The extent of the duty as Andrew Hannon perceived is clear as shown in further questioning:

"Q. As you sit there today, do you feel you have a duty to resolve all doubts in favor of the beneficiaries of the trust?

"A. I'm not sure—about the word 'in favor of.'

"Q. Is that your Answer?

"A. Yes.

"Q. As you sit there today, Mr. Hannon, if you had it all to do over again, would you take the same action on the claim of Reim and Ferreghy that you took in 1974?

"A. I don't know. That's a tough question, uh—from a legal standpoint I probably wouldn't, but from a moral standpoint, I probably would."

It is not difficult to infer from such testimony that the individual cross-defendants in their fiduciary relationship were conspiring with the officers and directors of the corporation (to whom, also a fiduciary duty was owed) to refuse to make the pension payments, the wrongful act constituting a breach of the fiduciary duty owed to cross-complainants.

We, therefore, conclude that the cross-complainants' second cause of action of conspiracy to breach the implied covenant of good faith and fair dealing was pleaded properly and proved.

## CROSS-COMPLAINANTS' CROSS-APPEAL

### Issue

*Whether the Award of Punitive Damages
Is Inadequate as a Matter of Law.*

Cross-complainants contend, in essence, that the award of $7,000 in punitive damages for each cross-complainant is inadequate, that the smallness of the sum was caused by error in certain evidentiary rulings, and by the failure of the trial judge to give proper punitive damages instructions.

### INSTRUCTIONS

The only instruction given by the court below pertaining solely to punitive damages was No. 14.71 of the California Jury Instructions, sixth edition, (hereinafter BAJI) as it appeared prior to modification after enactment of Civil Code section 3294: "If you find that plaintiff suffered actual damage as a proximate result of the conduct of the defendant on which you base a finding of liability, you may then consider whether you should award additional damages against defendant . . . for the sake of example and by way of punishment. You may in your discretion award such additional damages, known as punitive or exemplary damages, if, but only if, you find by a preponderance of the evidence that said defendant was guilty of [oppression] [fraud] [or] [actual malice] in the conduct on which you base your finding of liability.

"['Malice' means a motive and willingness to vex, harass, annoy, or injure another person. Malice may be shown by direct evidence of declarations of hatred or ill-will or it may be inferred from acts and conduct, such as by showing that the defendant's conduct was wilful, intentional, and done in reckless disregard of its possible results.]

"['Oppression' means subjecting a person to cruel and unjust hardship in conscious disregard of his rights.]

"['Fraud' as used in this instruction means an act of trickery or deceit, intentional misrepresentation, concealment or nondisclosure committed for the purpose of causing injury or depriving a person of his property or his legal rights.]

"The law provides no fixed standard as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice."

Cross-complainants requested two special instructions, based on *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980] set out below:

*Cross-complainants' Requested Instruction No. 8.*

"In the event you determine that an award of punitive damages is appropriate in this case certain factors should be considered by you in deciding upon a reasonable amount of punitive damages to be awarded. Among such factors are the need to deter the defendants and others from the same or similar conduct and the need to punish the defendants in a manner consistent with the offense in question. You may consider also the wealth of defendants."

*Cross-complainants' Requested Instruction No. 9*

"It follows that the wealthier a wrongdoer, the larger the award of exemplary damages need be in order to accomplish the objective of punishing the wrongdoer for malicious or oppressive conduct."

██ Cross-complainants now request that (1) we hold that the trial court's failure to give their version of requested instructions resulted in prejudicial error because the jury had insufficient standards on which to base a punitive damages award, and (2) that we approve the 1981 revised version of BAJI No. 14.71.

1. Prior to the 1981 amendment of Civil Code section 3294, (enacted originally 1872, amended in 1905), and at the time of the trial herein, the statute read: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

In *Toole v. Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, at page 719 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], the court turned back a challenge to the constitutionality of Civil Code section 3294. The *Toole*

appellant contended that it contained no "standard by which to measure the punishment, nor any limitation as to the amount to be awarded." In *Toole* the court states: "*We find no merit in this contention.* A plaintiff's right to exemplary or punitive damages, when the defendant's conduct justifies the award, is generally accepted, and may exist even in the absence of statute. Some authorities have said that the right to such damages is as old as the right to trial by jury. *When allowable,* the amount to be awarded lies within the sound discretion of the trier of fact [citations] .... Our statute does no more than recognize the right to punitive damages where the defendant has been found guilty of wrongful conduct showing fraud, oppression or malice.... *we see no offense to the Constitution,* and *no deprivation of any constitutional right of appellant in committing the assessment of such damages, including the amount to be allowed, to the sound discretion of the jury.*" (Italics added.) Appellant's petition for a hearing by the Supreme Court in *Toole, supra,* was denied.

■ A plaintiff, upon establishing his case, is always entitled of right to compensatory damages, but even after establishing a case where punitive damages are permissible, he is never entitled as a matter of right to them. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713].)

Whether or not punitives should be awarded and the amount to be awarded are matters within the discretion of the jury, since the degree of punishment depends on the peculiar circumstances of each case. (*Thomson* v. *Catalina* (1928) 205 Cal. 402, 406-407 [271 P. 198, 62 A.L.R. 235].)

■ It is true that exemplary damages must bear a reasonable relationship to the damage actually sustained by the plaintiff (*Toole, supra,* 251 Cal.App.2d p. 719); however, the purpose of this rule is to prevent an excessive allowance (*Brewer* v. *Second Baptist Church* (1948) *supra,* 32 Cal.2d p. 802) and there is no fixed ratio by which to determine the proper proportion between compensatory and exemplary damages. (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19].)

■ We are not unaware of the guidelines set out in *Neal, supra;* we do not interpret *Neal* to hold that an instruction given in the then existing language of Civil Code section 3294 is an incorrect statement because it failed to contain the helpful criteria contained in *Neal.*

Further, the jury heard the testimony as to the extent of the damage proximately caused by cross-defendants' failure to abide by its fiduciary duty. We are entitled to believe that the jury felt that its award constituted enough "punishment."

We, therefore, conclude that failure to give the requested instructions was not error.

2. BAJI No. 14.71 (1981 rev.) based in part on *Neal, supra*, reads, in pertinent part: "... The law provides no fixed standards as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice. [¶] In arriving at any award of punitive damages, you are to consider the following: (1) The reprehensibility of the conduct of the defendant, (2) The amount of punitive damages which will have a deterrent effect on the defendant in the light of defendant's financial condition, (3) That the punitive damages must bear a reasonable relation to the actual damages."

Those portions of BAJI No. 14.71, as quoted above, are extracted from the Supreme Court's opinion in *Neal*, in which are consolidated criteria utilized in other cases which have been held proper yardsticks by which to measure punitives. (*Neal, supra*, pp. 910, 928.)

The court in *Neal, supra*, at page 928, states: "In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages.[13]"

Footnote 13, in *Neal*, page 928, states "The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts. (*Evans* v. *Gibson* (1934) 220 Cal. 476, 490 [31 P.2d 389]; *Fletcher* v. *Western National Life Ins. Co., supra*, 10 Cal.App.3d 376, 409 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)"

In *Neal, supra*, utilization of these criteria, indicates the Supreme Court's recognition of the problems which juries face in making proper determinations to effectuate the purposes of Civil Code section 3294 in awarding punitive damages.

BAJI No. 14.71 (1981 rev.) incorporates these *Neal* principles and reflects partially the amendment of Civil Code section 3294. It does not

address, however, those provisions of Civil Code section 3294, subdivision (b), which pertain to employer liability for punitive damages.[2] It is suggested that an instruction incorporating this subdivision is desirable. Nevertheless, we find no reason not to uphold the validity of BAJI No. 14.71 (1981 rev.) as it is now written. We so hold.

### EVIDENTIARY RULINGS

■ Cross-complainants complain of several rulings, all of which concern the admission of evidence regarding the decision made by the court at the earlier trial on the complaint. It is contended that the testimony by Andrew Hannon regarding his suspicions that cross-complainants were guilty of fraud and embezzlement should not have been admitted because it was more prejudicial than probative and, therefore, violated Evidence Code section 352.[3] Further, it was contended, that if such testimony were permitted, then cross-complainants should have been permitted to introduce the findings of fact and conclusions of law and decision made by the trial court following the trial on the complaint.

We do not see that any of these rulings harmed cross-complainants' case in any manner. Obviously, the jury understood the instruction and confined their interpretation of Hannon's "suspicions" to the "reasons" why cross-defendants made the decision not to pay.

Further, we see no reason why the findings of fact and decision made in connection with the trial on the complaint should have been admitted. They were not relevant, in light of the record.

In any event, we see nothing in the record to indicate that these rulings in any manner tainted the jury which did, in fact, find in favor of the cross-complainants, so what harm was there?

---

[2] Civil Code section 3294, subdivision (b), provides: "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge, ratification, or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation."

[3] Evidence Code section 352 states: "Discretion of court to exclude evidence. The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We conclude that no error occurred therein, and that the award of punitive damages made to cross-complainants is not inadequate as a matter of law, and we deny the cross-appeal.

The judgment is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.