[Civ. No. 15120.  First Dist., Div. One.  Aug. 22, 1952.]

E. T. COMBS, Respondent, v. CALIFORNIA COTTON MILLS COMPANY (a Corporation), Appellant.

Marshall P. Madison, Francis N. Marshall, James Michael and Thomas E. Haven for Appellant.

Leroy R. Goodrich for Respondent.

WOOD (Fred B.), J.—Defendant has appealed from a judgment awarding plaintiff $10,000 as the reasonable value of his services in preparing for defendant a wage and bonus incentive plan covering the work of all of its employees in the several departments of its textile plant.

The only issues presented by defendant upon this appeal pertain to the sufficiency of the evidence to support the findings of fact.

The trial court found: immediately prior to June, 1945, plaintiff had for a number of years been employed by defendant as superintendent of its textile plant, an employment which continued without interruption until September, 1946. About June 15, 1945, defendant, acting by and through its general manager, Burton A. Olsen, orally asked plaintiff to undertake, wholly outside of the scope of his regular employment as superintendent and on plaintiff's own time and entirely outside of his regular hours of work, the preparation of a comprehensive and adequate wage and bonus incentive plan covering the work of all of its employees in the several departments of its textile plant and under the varying and intricate types and methods of handling and manufacture of its products in the plant, and orally agreed to pay plaintiff the reasonable value of his services in the preparation of such plan for the defendant. In accordance with this agreement plaintiff immediately began the preparation of such a plan which was completed by plaintiff in stages for the several departments of defendant's business and was installed for each department as completed, beginning with the card room of defendant's plant about September 30, 1945. The entire plan was completed and installed in all departments on or about April 30, 1946. It was satisfactory to and accepted by defendant and defendant's employees and was thereafter used, maintained and operated by defendant until May, 1947. It involved a sys-

tem for evaluating the production or services of each individual worker in each department depending in its application to each individual upon the nature of the work of the department and of the individual, the materials used and the textiles produced, and upon the varying rates of pay for the workers in different tasks and different conditions. It provided for a minimum pay for a fixed standard of production and a bonus for excess production for each individual worker. In accordance with the agreement, plaintiff prepared and produced the plan by devoting thereto his own time outside of his regular hours and duties as superintendent of defendant's plant and outside of and in addition to the full performance of his duties as superintendent during the period from about June 15, 1945, to April 30, 1946. $10,000 is the reasonable value of the services so rendered by plaintiff.

Defendant concedes that "plaintiff did produce an incentive plan . . . comprising a sizable volume of figures and computations," that this "plan was completed piecemeal and was put into effect department by department as completed," and was used until May, 1947, when "the union finally and unconditionally rejected the plan and it was discarded." By these statements in its opening brief, defendant admits that plaintiff prepared an incentive plan which defendant installed and used until rejected by its employees.

Despite that admission defendant claims that plaintiff failed to prove that he performed the alleged contract. Plaintiff testified that the figures set forth in the plan as finally prepared and approved were based upon extensive studies of operations in each department of the plant, and a great number of calculations, in a study which he made extending from June 22, 1945, to April 30, 1946; that he worked on a regular schedule every night from 6 to 12, and sometimes later, Monday through Friday of each week; on Saturdays from 7 a. m. to 6 p. m. and at night; and on Sundays from 7:30 to 11:00. He did this in addition to adhering to his regular daily hours of work and fulfilling all his usual duties as superintendent, except for two weeks in November, when he made a trip east for the company to buy equipment, and two days at Christmas time. He stated the aggregate time devoted to the work was the equivalent of 279 days of 8 hours each. He estimated the value of the services rendered at $125 per day. Soon after com-

pleting the plan, he told defendant's manager he should get between $10,000 and $20,000; at that time he was willing, if the matter could be settled amicably, to settle for $10,000.

As an example, of the kind of studies he made, plaintiff introduced in evidence, as Exhibit B, three work sheets, printed forms upon which he made certain entries on December 6, 1945. After the cause had been submitted and the court had made an order that plaintiff was entitled to judgment in the sum of $10,000, defendant moved to reopen the case upon the ground claimed by it that Exhibit B was a fabrication and fraud upon the court. The case was reopened and evidence was adduced by the respective parties upon that issue. After consideration thereof the court again concluded that plaintiff was entitled to recover.

■ Defendant insists that the proof indisputably shows that Exhibit B could not have been made until after December, 1945, undoubtedly was fabricated by plaintiff, probably in 1948, when preparing for trial. This claim is predicated, principally, upon the similarity between the three sheets of Exhibit B and certain printed forms used by Dan River Mills, Incorporated, of Danville, Virginia, coupled with evidence tending to show that Dan River Mills had no such forms until after 1945, and the fact that plaintiff was in the employ of that company and made a time study there, in 1948, similar to that exemplified by Exhibit B. Defendant's expert witness, E. O. Heinrich, was of the opinion that the three sheets of Exhibit B were printed from the same plate as was defendant's Exhibit 31. There was testimony that the first printing from that plate occurred in May, 1947.

However, there was evidence that the forms used in Exhibit B were printed and in use at Dan River Mills in 1945. Henry W. Hopkins, Jr., testified that in the latter part of 1944 he entered the employ of Dan River Mills, took charge of its print shop and continued in that capacity until the end of January, 1496. During that time he printed forms for engineers who were conducting time and motion studies for the company, did so by the multilith process. During all of that period, 1943-46, a tabular form known as S-1130, such as appears in Exhibit B, was in existence and in use at Dan River. It was originally a hand-set form but the witness printed it on a multilith, making a negative of the earlier printed form. He also printed form S-1130-A in the

spring of 1945 for the Standards Department of the Dan River Company. It was like form S-1130 but without the first three columns, to give a wider margin. That form became standard and more copies were printed. The witness identified another form in evidence as a later printing of S-1130-A. Plaintiff produced an expert witness, Dr. Paul L. Kirk of the University of California faculty, who made a detailed microscopic study of the several forms involved, noting their similarities and dissimilarities. He concluded that Exhibits B and 31 were not made from the same plate; also, that one of the sheets of Exhibit B represented a different printing and possibly a different plate than the other two sheets of that exhibit. He was of the opinion that the various errors and deviations in the various forms had been derived over a period of time from some older and common form.

Here we have a conflict in evidence which the trial court resolved in favor of the plaintiff. When refusing to make a specific finding as to the authenticity of Exhibit B, because not an ultimate fact, the trial judge said he had concluded that the testimony showed that Exhibit B was prepared at the time claimed by plaintiff. We see nothing incredible about that view of the testimony. Under these circumstances, a reviewing court cannot say as a matter of law that plaintiff failed to prove that he made the entries on Exhibit B at the time claimed by him. Even if there were a failure of proof in that regard, it would not follow as a matter of law that all of the other evidence favorable to plaintiff must be rejected. In such an event, it would be for the trier of the facts to determine how much of the other testimony of plaintiff was true and how much untrue. (See *Hicks* v. *Ocean Shore Railroad, Inc.,* 18 Cal.2d 773, 780 [117 P.2d 850], and cases cited.)

In this connection we note that defendant makes an assignment of error predicated upon a claim that the trial court imposed upon defendant the burden of disproving the authenticity of Exhibit B, instead of holding plaintiff to the burden of proving it. Such a claim is not supported by the record. During the discussion of proposed findings, defendant's counsel asked the judge: "If I understand your Honor correctly, the burden of proof with respect to Exhibit B, in your Honor's eyes, has been shifted to defendant in this case." The court answered, "No."

■ Defendant contends that plaintiff failed to prove an express contract for extra compensation, claiming that the services in question were a part of his duties as superintendent and assistant general manager and that the evidence shows no contract to pay plaintiff anything in addition to his salary. Here again defendant invokes the evidence most favorable to it. Plaintiff testified that his duties did not embrace services of the kind involved in preparing the incentive plan. Plaintiff's successor as defendant's superintendent testified that normally the work of installing such a plan in a small plant, such as defendant's, would be done by the superintendent unless he is tied up and cannot spare the time. The evidence here indicates that plaintiff had been assigned several extra jobs which together with his work as superintendent fully occupied his working time. Also, it appears that Mr. Olsen, defendant's general manager, negotiated with independent engineering firms for the doing of this job before turning to plaintiff to get it done. Plaintiff testified that Olsen said they couldn't get anybody to do the work and Olsen asked plaintiff if he could do it, and plaintiff told him "no," because he had a full time job as it was and had taken on several extra jobs besides being superintendent. Later Olsen said maybe plaintiff could do it on his own time outside of the superintendent's hours. Plaintiff told him it could be done but would entail a lot of hard work and a lot of extra time. Asked if there was any discussion in that conversation as to whether or how he would be paid, plaintiff said, "No, there wasn't any question about how it was to be paid but he would treat me right if I would do the work and he would see that I would be given a satisfactory settlement" for the work that plaintiff would do outside of his regular hours; and that plaintiff agreed to do it. There is evidence that in December, 1945, Miller, chairman of defendant's board and a member of its management committee, told plaintiff that if the incentive plan was adopted and satisfactory, plaintiff would be paid for it. Plaintiff has now done the work. Defendant has accepted and installed the product. That leaves only the price or compensation to be ascertained. The parties have not specified it. The law supplies the means of measurement, declares it to be the "reasonable worth" of the product of plaintiff's services. "When a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount

thereof to the discretion of an interested party, the consideration must be so much money as the object of the contract is reasonably worth.'' (Civ. Code, § 1611. See, also, *Hunter* v. *Sparling,* 87 Cal.App.2d 711, 724-725 [197 P.2d 807].)

■ Defendant next contends there was no showing that Olsen, defendant's manager, had authority to make such a contract for defendant. It appeared that compensation of officers who were also members of the board of directors was fixed by defendant's board of directors; of other officers, by a committee consisting of Olsen, Miller and Hamilton. Plaintiff was not a member of the board of directors. There is evidence indicating that as superintendent plaintiff was not an ''officer'' of defendant, and that his added title of ''assistant general manager'' gave him no additional or different status. He worked under the direction of Olsen, and, in Olsen's absence, under the direction of Hamilton. It would also appear that the formulating of an incentive plan was not the function of an officer of defendant, but, as in this case, the subject of a special contract for the rendition of a technical service. Olsen arranged with Douglas Sterling Company and with Bennorth & Company to make preliminary studies concerning an incentive plan. Olsen testified that his duties as general manager had to do with the operation of the plant, the employment of the personnel and the direction of operations generally. In making the contract with plaintiff, Olsen was acting within the scope of his powers as general manager of defendant, in the absence of any proof to the contrary. (See *Marsh* v. *Arch Rib Truss Co.,* 56 Cal.App.2d 811, 813 [133 P.2d 412], and cases cited in 6A Cal.Jur. 1155-1159, Corporation, § 656.)

■ Finally, defendant claims that various salary increases received by plaintiff compensated him for his services in formulating the incentive plan. A brief summary of salary increases will indicate sufficient support for the finding that plaintiff has not been paid. The following increases in plaintiff's salary were more or less in line with salary increases given the other principal employees of defendant during the same period: In 1943, increased from $500 to $625 a month; to $675 in July, 1945; and to $833.32 in May, 1946. Oregon Flax Textiles, a subsidiary of defendant, paid him $200 from June 1, 1945, to September, 1946, for work done for the subsidiary, not for defendant. When he left defendant's employ in September, 1946, defendant

paid him three months' salary, which plaintiff testified was separation pay, agreed upon when he entered the defendant's employ in 1937. We see no basis for disturbing the finding that no part of the $10,000 due plaintiff has been paid.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.