[S. F. No. 18110. In Bank. Oct. 27, 1950.]

EDWARD BROWN & SONS (a Corporation), Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Respondent.

Arthur B. Dunne and Dunne & Dunne for Appellant.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Respondent.

SCHAUER, J.—Plaintiff appeals from an adverse judgment entered upon a directed verdict in its action seeking recovery for damage to its basement offices caused by water assertedly backing up and escaping from a defective side sewer, claimed by plaintiff to have been negligently maintained by defendant city.[1] We have concluded that plaintiff has failed to establish a cause of action against the city, and that the judgment must be affirmed.

The damaged basement offices are in a building owned by plaintiff which is located on the north line of California

---

[1] See section 2 of the Public Liability Act of 1923, Stats. 1923, page 675; Deering's Gen. Laws, Act 5619 (now found in Gov. Code, § 53051): "Counties, municipalities and school districts shall be liable for injuries to persons and property resulting from the dangerous and defective condition of public streets, highways, buildings, grounds, works and property in all cases where the governing or managing board of such county, municipality, school district, or other board, officer or person having authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of any such street, highway, building, grounds, works or property and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition."

Street (which runs east and west) between Montgomery and Sansome Streets (which run north and south), and is known as 432 California Street. The building above the street level "comes up to" plaintiff's "property line." The basement extends underneath the sidewalk of California Street "to the curb line" of that street, which is 19 feet beyond the "property line." Down the center of California Street is a main sewer, "egg-shaped," 5 feet by 3 feet in diameter, constructed of brick, in which the flow is eastward between Montgomery and Sansome Streets. Down Sansome Street is a circular concrete main sewer, 8 feet 6 inches in diameter, in which the flow is northerly at the intersection with California Street. These two sewers are combined storm and sanitary sewers. The California Street sewer terminates at Sansome Street, but is connected to the sewer on Sansome by an 18-inch pipe. Plaintiff's property was connected with the sewer under California Street by a side sewer. A plumber called in by plaintiff at the time of the flooding, testified that upon inspection he found that the plumbing in plaintiff's building was of cast-iron pipe which led down through the building, under the floor in the front part of the basement which was under the sidewalk, and then through a trap and beyond the basement, or retaining, wall at the curb line. On the street side of that wall, it connected with the side sewer, which was of concrete construction and in the opinion of the witness (who had 45 years of experience) was at least 65 years old.

The evidence further indicates that in 1940 water was noticed in plaintiff's basement and the city water department, after investigation, stated that the trouble was from the sewer. At least two men from the city sewer department then inspected the premises. Thereafter, in October and November, 1940, sewer department men made tests with dye. One test was by pouring water and dye into a pipe on the roof of plaintiff's building, which emerged into the basement through a crack in the floor and a crack in the retaining wall. From September, 1940, "through to January," 1941, "some three or four leaks" occurred during rains.

On January 21, 1941, during a high tide and a rainstorm, water pressure under the 6-inch concrete floor at the front of the basement caused the floor to buckle and flooded the basement. The water came "from a space three or four feet inside" the retaining wall and was flowing back into the building. The basement was pumped out and the plumber

called in. He found no breaks in the house plumbing. He crawled under the retaining wall where the water had washed away the soil and found no break in the cast-iron pipe within the wall and no leak around the trap, but discovered that the concrete side sewer pipe, which showed "pretty much of wear," had disintegrated. The plumber made repairs by "drifting" a new pipe through the old side sewer to the main California Street sewer where it was sealed by the city; he sealed it at the house end.

Defendant city and county admits its ownership and control of the main sewer down California, but urges that sections 105 through 112 of its Public Works Code[2] (San

[2]Those sections provide (italics are added): "SEC. 105. It shall be unlawful for any person, firm or corporation to make, or to cause or to permit to be made, any excavation in or under the surface of the roadway of any public street in the City and County of San Francisco for the purpose of constructing, *reconstructing* or *repairing* any *private side sewer* or drain therein, or to construct in or under the surface of the roadway of any public street any such side sewer or drain, or to connect the same with any main public sewer, or to *reconstruct or repair any such side sewer* or drain heretofore constructed in or under the surface of the roadway of any public street and connected with a main public sewer.

"SEC. 106. *When* at any time *any person,* firm or corporation *desires* the construction in or under the roadway of any public street, in the City and County of San Francisco, of any private side sewer or drain and the connection thereof with a main public sewer, or *the reconstruction or repair of any such side sewer* or drain heretofore constructed and connected with such public sewer, or is required by law to have such construction, reconstruction or repair done or made, *such person,* firm or corporation *shall in writing request* the Department of Public Works to make or cause to be made such construction, reconstruction or repair.

"SEC. 107. *Upon such request being so made, it shall be the duty of said department* to make an estimate of the expense of opening or tearing up the roadway of the street wherein such construction, reconstruction or repair is to be made and of the restoration of the same to as good a condition as it was in before said opening or tearing up, together with the estimated expense of labor to be performed and materials to be used in such construction, reconstruction or repair, including a fee of Two ($2.00) Dollars to be applied as for services for official supervision.

"SEC. 108. Such person, firm or corporation must thereupon deposit the amount of such estimates, inclusive of said fee, with the Department of Public Works, the same to be paid by said department into the Side Sewer Fund. *When such amount shall have been so deposited, it shall be the duty of the said department to proceed to* open or tear up the roadway of such street and construct the side sewer or drain so requested, in a proper manner, with approved material, and properly connect the same with the main public sewer, or to *reconstruct or repair the existing side sewer* or drain, in a proper manner, under its supervision, and thereafter said department shall at the proper time restore the said roadway to as good a condition as it was in before such opening or tearing up.

"SEC. 109. In case such person, firm or corporation elects to furnish

Francisco Municipal Code,[3] chap. X) establish that the side sewer here involved was plaintiff's private property and was not public property, or, except as to "mechanical processes of repair," property under defendant's jurisdiction and control so as to place upon defendant "the absolute duty of repair and maintenance." Plaintiff urges that sections 118 and 119[4] of the same code indicate that there is a distinction between the meaning of the words "private side sewer" which appear in sections 105 through 113, and the words "side sewer" which are used in sections 118 and 119; i.e., that the city is responsible for side sewers from the main sewer line down the center of California Street to the curb line of abutting property and that any responsibility of the property owner is only for the "private side sewer" "which would go under

at his or its own expense any or all of the materials needed for use in such construction, reconstruction or repair, which privilege of such election is hereby expressly accorded, then the estimates hereinabove provided for shall not include as an item therein the estimated expense of any or all of the said materials to be so furnished.

"SEC. 110. Contracts for the doing of the aforesaid work or any part thereof may be let by the said Department of Public Works in the manner provided in the Charter of the said city and county, or such work or any part of the same may, at the option of said department, be done by days' labor.

"SEC. 111. If the expense of such construction, reconstruction, or repair has been more than the aforesaid estimate given by the Department of Public Works, the person, firm or corporation shall be indebted to the City and County of San Francisco for such balance; and the same shall constitute a lien upon the property of such person, firm or corporation. Said lien shall remain in force until such balance has been paid, or until the lien shall be legally discharged. Said lien may be enforced by suit brought by the said city and county in accordance with the provisions of the Code of Civil Procedure of the State of California.

"SEC. 112. If the expense of such work has been less than the aforesaid estimate, then the surplus shall constitute a claim in favor of such person, firm or corporation, against the said city and county, and as such shall be presented, approved and paid as other claims.''

[3] The parties stipulated that the court might take judicial notice of the provisions of such code dealing with sewers.

[4] Those sections read: "SEC. 118. It is hereby determined that in the improvement of streets by the construction of sewers therein, that the resolution of intention adopted as a part of the proceedings relating to such improvement shall provide for the construction of side sewers to the curb line of abutting property, except where the City Engineer reports to the Department of Public Works that construction of certain side sewers is not advisable.

"SEC. 119. In the case of all sewers constructed by public funds, the specifications and contract shall make like provision for the construction of such side sewers, except where the City Engineer reports to the Department of Public Works that such side sewer construction is inexpedient, and when side sewers are constructed to the curb line under the provisions of this Article, the cost of such side sewers shall be assessed to the abutting property.''

that part of the street which is the sidewalk from the property to the curb line.''

Plaintiff also cites section 108 of the city charter (Stats. 1935, p. 2420), to the effect that when a street has been paved for not less than one block, is in good condition ''and sewer, gas and water pipes have been laid therein, the same shall be accepted'' and it shall be the duty of the owner of any property fronting on a public street ''to keep the sidewalk in front thereof in good repair and condition,'' and argues that the duty of the owner ''is restricted to sidewalks and does not touch any sewers.''

■ The attempted distinction between different concepts of side sewers seems to be without substance. Sections 118 and 119, rather than supporting plaintiff's contention, appear to be entirely consistent with, if not to impliedly confirm, the provisions of sections 105 through 111 which place upon private ''persons, firms or corporations'' the expense of side sewer construction and repair.

We are of the view, furthermore, that certain testimony pointed out by defendant city relative to inquiries made by its agents prior to the date of the flooding of plaintiff's basement, as to whether plaintiff wished the side sewer repaired, is determinative of this action. On cross-examination plaintiff's witness, Mr. Gray, the treasurer of plaintiff corporation, testified as follows:

''Q. Mr. Gray, do you recall on November 6th being present . . . when Mr. Muheim [defendant's superintendent of sewer repair] and Mr. Tegmeyer, a former employee of [defendant] . . ., and Mr. Bunting, then assistant superintendent of sewers, and Mr. Brown [vice-president of plaintiff corporation] and yourself were present,—do you recall that meeting? . . . A. Not specifically. It could have happened, because we had several discussions.

''Q. Do you remember meeting with Mr. Muheim and some of the employees of the city, and with Mr. Brown, . . . on or about November 6th, 1940, which was before the break but after you first reported the seepage of water? A. I think there was such a discussion, but I wouldn't be sure . . .

''Q. Following the meeting that I have mentioned . . . on November 6th, 1940, do you recall receiving a telephone call from Mr. Muheim on or about November 18th, 1940, regarding this matter? A. No, I do not.

''Q. You don't recall him calling you and asking you what

was to be done with relation to the leak that was occurring there in the basement? A. All I can say is that we did determine that it was unwise to open up the street in the wintertime, when it was raining, and we were below tide line. And it was undoubtedly in connection with that that he wanted to know if we were going to take any action.

"Q. Do you recall the conversation? A. I recall a conversation along those lines . . .

"Q. Isn't it a fact, Mr. Gray, that at that time during that conversation you . . . said to Mr. Muheim that 'we are taking care of our own trouble'? A. I wouldn't want to swear to the words, but after due consultation with Mr. Sullivan [plaintiff's plumber] and Mr. Muheim, we were the ones that had to make the decision, and on the basis of all of the facts it was unwise to tear up the street or the basement floor while it was raining, in the wintertime, and we decided it should be postponed until the rains had stopped.

"Q. You . . . haven't answered my question. The question was: Isn't it a fact that at that time you said, 'We are taking care of our own trouble'? . . .

"The Court: . . . Will you answer that, please? Did you or did you not make that statement at that time? A. I wouldn't say as to the exact words, but that would be the context of the decision that was made at that time, that we would not tear up the street.

"Mr. Skelly [Attorney for defendant]: Q. . . . The question was did you or did you not make that statement to Mr. Muheim? A. Well, I can't say in just those words, but a statement to that effect. . . .

"Q. . . . it is your testimony that you did make some such statement to Mr. Muheim at that time, is that true? A. I think so."

Mr. Brown, plaintiff's vice-president, testified on cross-examination: "Q. . . . You were in the courtroom and you heard me ask Mr. Gray concerning an alleged conversation that I mentioned that took place . . . on or about November 6th, 1940, when Mr. Muheim and Mr. Tegmeyer and Mr. Bunting were present? Do you remember that? A. I remember several conferences with the gentlemen, but I can't distinguish one from the other, as to this.

"Q. This was before the . . . damage caused by the flooding, as you described it here, is that right? A. Yes.

"Q. At any time after that conversation did you or your firm place any deposit with the Central Permit Bureau for

work to be done outside of the curb line in the street with relation to this side sewer? . . . A. No.''

Mr. Muheim, the superintendent of sewer repair of defendant city, testified that on November 5 or 6, 1940, ''I told Mr. Brown in order to find out what was the trouble he could either dig up the basement around the plumbing fixtures, or make a deposit with the City's Permit Bureau to enable the sewer department to dig down to the sewer out in the street. That either one of those two things should be done. Because 'we know there is some trouble there.' . . . I checked two weeks later, and there was no deposit made. It was about November 20. . . . And Mr. Gray told me that they were taking care of their own troubles.'' This testimony is not only not controverted by plaintiff, but is confirmed by the testimony of plaintiff's officers, quoted hereinabove.

Under the circumstances disclosed by the quoted testimony it is apparent that plaintiff has failed to make out a case against the city. ▆ It is a familiar maxim of jurisprudence that ''He who consents to an act is not wronged by it.'' (Civ. Code, § 3515.) And as stated at 1 Cal.Jur. 334, § 24 (see also cases there cited), ''It is a general rule of the English law that no one can maintain an action for a wrong where he has consented to the act which has occasioned his loss.'' Thus, in *Richardson* v. *City of Eureka* (1895), 110 Cal. 441, 446 [42 P. 965], where, by the erection of a culvert across a street, defendant city had obstructed a watercourse, to the injury of the plaintiff, and had endeavored to redress the injury by means of an appropriate sewer connection, but plaintiff refused to permit the connection, plaintiff was denied an injunction against the alleged wrong. (See also *Warden* v. *City of South Pasadena* (1914), 168 Cal. 612 [143 P. 776]; *Diener* v. *Shaul* (1923), 60 Cal.App. 633, 634 [213 P. 706]; *Cummings* v. *Kearney* (1903), 141 Cal. 156, 160 [74 P. 759]; Rest. of the Law of Torts, §§ 892, 893.)

▆ Here, plaintiff itself made the ''decision'' not to undertake repair work ''while it was raining, in the wintertime,'' and informed the city to the effect that ''We are taking care of our own trouble.'' Consequently, the damage which resulted from plaintiff's own inaction cannot now be charged to defendant city.

Plaintiff further argues that the disintegration of the side sewer and the flooding of plaintiff's property was caused by the backing up of flood waters in the main California Street

sewer and into the side sewer here involved, that such backing up resulted "because the connection of the 5'x3' California Street sewer with the 8' 6" Sansome Street sewer was by only an 18" pipe," which was "not adequate to handle the amount of liquid and material which the size of the California Street sewer shows reasonably could be anticipated," and that plaintiff's property was thus damaged within the constitutional provision that "private property shall not be taken or damaged for public use without just compensation." (Cal. Const., art. I, § 14.) Such argument not only begs the question here involved (responsibility for repair of the side sewer), but is without substantial support in the evidence. The evidence unequivocally shows that leakage into plaintiff's basement had occurred on several occasions during the three or four months preceding the January 21 flooding which caused the damage at issue; there is no evidence whatsoever to indicate that disintegration of the approximately 65-year-old side sewer had not previously occurred and that it was caused by the events of that date; and there is no reasonable basis for concluding that the damage alleged would have occurred if the side sewer had been properly maintained. It seems clear that if plaintiff had "taken care" of its own trouble, as it had informed defendant city it intended to do, repairs would have been made so that flood waters from the California Street sewer presumably would have had no outlet through which to reach plaintiff's basement.

In view of our decision that plaintiff has failed to establish the responsibility of defendant city for the damage here involved, it is unnecessary to discuss the contention of the city that plaintiff did not comply with a State Claims Statute (Deering's Gen. Laws, Act 5149, § 1).

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.