PINNEY & TOPLIFF, a corporation, Plaintiff,

v.

CHRYSLER CORPORATION, a corporation, Defendant.

No. 850–58.

United States District Court
S. D. California,
Central Division.

Sept. 17, 1959.

802

Gold, Needleman & Fain, by Harry M. Fain, and J. Howard Sturman, Beverly Hills, Cal., for plaintiff.

McCutchen, Black, Harnagel & Shea, by G. Wm. Shea, John Lawrence Leary, Los Angeles, Cal., and Keith A. Jenkins, Detroit, Mich., for defendant.

YANKWICH, District Judge.

In this case we are to determine whether the plaintiff is entitled to recover under a Complaint seeking damages for fraud, either actual or constructive, or deceit,[1] or, in the alternative, on the theory of promissory estoppel,[2] or under the federal Automobile Dealers Act.[3]

At the request of the parties the Court has agreed to try the separate "issue" of liability first.[4] So the question of damages is not at present before the Court.

As is evident, two of the remaining causes of action are brought under State law, the third under Federal law. While the same amount of damages is sought under all the remaining claims, treble damages are also asked under the Clayton Act,[5] as well as costs and attorneys fees.

I

Fraud and Coercion

In essence, the proof in the case was directed to an attempt to show that the defendant, who will be referred to as "Chrysler", made certain promises and undertakings to the plaintiff, who will be referred to as "Pinney", with relation to the termination of a dealership at El Centro, California, which were false and fraudulent under California law and constituted coercion and intimidation or threats of coercion or intimidation under the federal statute.[6] Before considering the facts it is well to set down certain fundamental principles which govern the quantum of proof in cases of this character.

Pinney is a California corporation, Chrysler a Delaware corporation.

1. California Civil Code, §§ 1571, 1572, 1573, 1709, 1710.

2. Carpy v. Dowdell, 1897, 115 Cal. 677, 687, 47 P. 695; Hunter v. Sparling, 1948, 87 Cal.App.2d 711, 725–726, 197 P.2d 807; Wade v. Markwell and Company, 1953, 118 Cal.App.2d 410, 420, 258 P.2d 497, 37 A.L.R.2d 1313.

3. 15 U.S.C.A. §§ 1221–1225.

4. Rule 42(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

5. 15 U.S.C.A. § 15.

6. 15 U.S.C.A. § 1221.

Two of the claims being based on diversity of citizenship are governed by State law.[7] And under California law there is a presumption of fair dealing which is tantamount to the presumption of innocence in criminal cases.[8] However, the statutory definitions of fraud and deceit are very broad. The relevant sections are printed in the margin.[9] Because of the broad scope of these provisions which have been in the California Codes since their enactment in 1872, the courts have laid down the rule that the evidence in proof of fraud must be clear and convincing.[10] This is also the general and the federal rule.[11] And whether we are dealing with actual or constructive fraud there must be a false representation or promise as to a material fact, knowledge of its falsity when made, or lack of reasonable ground to believe in its truth, intent to deceive, or suppression, and reliance with resulting damages.[12]

7. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188; Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 108, 65 S.Ct. 1464, 89 L.Ed. 2079; Angel v. Bullington, 1947, 330 U.S. 183, 186–187, 67 S.Ct. 657, 91 L.Ed. 832; Woods v. Interstate Realty Co., 1949, 337 U.S. 535, 537–538, 69 S. Ct. 1235, 93 L.Ed. 1524; Bernhardt v. Polygraphic Company of America, Inc., 1956, 350 U.S. 198, 202–203, 76 S.Ct. 273, 100 L.Ed. 199.

8. Levy v. Scott, 1896, 115 Cal. 39, 42, 46 P. 892; Hall v. Susskind, 1898, 120 Cal. 559, 563, 53 P. 46; Truett v. Onderdonk, 1898, 120 Cal. 581, 588, 53 P. 26; Goodrich v. Tulare Ice Co., 1956, 140 Cal.App. 2d 224, 226–227, 294 P.2d 1037.

9. Actual fraud is defined
   "§ 1572. Actual fraud
   "Actual fraud, what. Actual fraud, within the meaning of this Chapter, consists of any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
   "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
   "2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
   "3. The suppression of that which is true, by one having knowledge or belief of the fact;
   "4. A promise made without any intention of performing it; or
   "5. Any other act fitted to deceive." California Civil Code, § 1572.
   Constructive fraud is defined:
   "§ 1573. Constructive fraud
   "Constructive fraud. Constructive fraud consists:
   "1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
   "2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." California Civil Code, § 1573.
   The sections concerning deceit, defining it, and the conditions of recovery are:
   "§ 1709. Deceit; damages
   "Fraudulent deceit. One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." California Civil Code, § 1709.
   "§ 1710. Deceit defined
   "Deceit, what. A deceit, within the meaning of the last section, is either:
   "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
   "2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
   "3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,
   "4. A promise, made without any intention of performing it." California Civil Code, § 1710.

10. Ryder v. Bamberger, 1916, 172 Cal. 791, 799–800, 158 P. 753; Noll v. Baida, 1927, 202 Cal. 98, 101–102, 259 P. 433; Mills v. Hellinger, 1950, 100 Cal.App.2d 482, 486, 487, 224 P.2d 34; Maslow v. Maslow, 1953, 117 Cal.App.2d 237, 242–243, 255 P.2d 65.

11. 37 C.J.S. Fraud § 114; Pacific Royalty Company v. Williams, 10 Cir., 1955, 227 F.2d 49, 55.

12. Southern Development Co. of Nevada v. Silva, 1888, 125 U.S. 247, 250, 8 S.Ct. 881, 31 L.Ed. 678; Restatement, Contracts, §§ 470–471; California Civil

## II

### The Basic Issues in the Case

■ We are of the view that there is no clear and convincing evidence of fraud or deceit, actual or constructive, which would warrant a judgment in favor of Pinney on the question of liability.

#### A. Pinney's Contentions

The chief basis for the claim of fraud, as alleged in the Complaint, is that Pinney, beginning in 1954 and continuing a long time thereafter, informed Chrysler, through its district and regional managers, that they desired to sell the Agency Agreement, entered into August 20, 1952, whereby Pinney became the Dodge direct dealer for Dodge automobiles and trucks and Plymouth automobiles for the El' Centro territory. The Complaint also averred that Pinney stated that, in the event a buyer could not be secured, they would be compelled to terminate the agency, as their President desired to enter law school. In response to these statements it was alleged that Chrysler agreed to secure a buyer within a reasonable time and, in the event the buyer was not secured, Pinney would be immediately notified so that they could terminate the agency.

In the light of these allegations the main problems presented by the proof are, as correctly stated by counsel for Pinney:

(1) Whether Chrysler, through any duly authorized representative, promised or represented to Pinney that if they would continue their operations, Chrysler would produce a satisfactory buyer for their dealership within a reasonable time;

(2) Whether Pinney reasonably relied on such promises or representations to their detriment;

(3) Whether Chrysler, through its representatives either (a) made such promises or representations without intention of performing or fulfilling them or knowing them to be untrue or having no basis for believing them to be true, or (b) suppressed material facts which suppression was likely to mislead Pinney, or (c) misled or took advantage of Pinney in breach of a duty imposed by the relationship of the parties.

In essence, Pinney asserts that Chrysler, through its district and regional managers, Jack A. Wixom and Harold Erskine Wyatt, agreed, in consideration of Pinney's continuing in business, to secure a buyer for the dealership.

#### B. The Wish and Efforts to Terminate

Undeniably, the desire to sell originated with Pinney who were dissatisfied with the conditions as of the fall of 1954 and whose President, in 1955, had determined to enter Stanford Law School, a fact which was not communicated to Wixom until late in 1955. Wixom tried to dissuade him from doing so, urging that he was sacrificing what, for several years, had been a successful business operation.

While Chrysler had an interest in maintaining the dealership at El Centro, nothing was done by them to discourage the sale. Neither L. C. McDonald, Wixom or Wyatt, who did not meet Pinney until June 27, 1956, ever promised to find a dealership. Actually, the testimony is that they had no such express authority. And it is doubtful whether their promise, if made, would bind the company.[13] However, regardless of actual authority, of Chrysler agents, under took to do so within the scope of their employment, they might, under California law, bind Chrysler.[14] But the credible evidence in the record is that no such promise was made by McDonald or Wyatt, who were

Code, § 1572, subds. 2 and 4, § 1709, § 1710, subd. 4; Pacific Royalty Company v. Williams, supra note 11; Wishnick v. Frye, 1952, 111 Cal.App.2d 926, 930–931, 245 P.2d 532; Gonsalves v. Hodgson, 1951, 38 Cal.2d 91, 100, 237 P.2d 656; Berkey v. Halm, 1950, 101 Cal. App.2d 62, 69, 224 P.2d 885; Gagne v.

Bertran, 1954, 43 Cal.2d 481, 487–489, 275 P.2d 15.

13. General Motors Corp. v. Keener Motors, Inc., 6 Cir., 1952, 194 F.2d 669, 673–674.

14. California Civil Code, §§ 2315–2316.

district managers during the period, or by Wixom who was regional manager from November 1953 to March 1956, or by Robert B. McCurry who succeeded him. Pinney claims that McCurry, on or about September 11, 1956, made the final promise to secure approval of a transfer of the agency to a group known as the "Burton-Battenfield-Measures" group.

There is much conflict in the record as to dates. But the credible evidence shows that, at all times, from beginning to end, the most Chrysler's representatives in the field did was to *offer to assist in finding a buyer*, at the same time leaving to Pinney the right of finding buyers, subject to final approval of the buyer by Chrysler. Neither the district manager nor the regional manager could *do more than recommend* to Chrysler's head office, which had the final say as to whether the buyer would be approved and would, in case of approval, sign the written transfer of dealership. It was stated at the trial that, at times, when a district and regional approval had been given, Chrysler's own investigating force found derogatory matters concerning the proposed transferee, which led to disapproval of the recommendation.

The record shows that attempts were made by Pinney and at least four prospects were consulted and given a sales formula. (Answer to Defendant's Interrogatories, No. 48.) The persons consulted did not satisfy the requirements as to experience or were not, otherwise, suitable. In reality, only one group of buyers was considered seriously, the group known as "Burton-Battenfield-Measures". They declined to consummate the sale because they refused to accept a single dealership—Dodge.

Pinney contended that he was surprised when, at the September 7, 1956, meeting, concerning the sale to this group, it was announced that a policy had been established by Chrysler against future dual dealerships.

## III

### The Policy Against Dual Dealerships

**A. *The Issue as to Single Dealership***

The record is uncontradicted that on August 24, 1955, a circular was prepared and sent out to all Chrysler dealers to the effect *that separate dealerships* would be the future policy. Unrefuted testimony of the printing and mailing of this to all dealers is contained in the deposition given by James Morgan, a Chrysler employee in charge of printing and mailing. His testimony is supplemented by documentary proof of expenses incurred in conjunction with such printing and mailing. This notice having gone to all dealers, *it was not necessary* that district or regional managers of Chrysler give additional information to Pinney, until *such time as they were ready to sell the agency*. For it is undisputed that the new condition was to *apply only to new dealers*.

This was made plain by Wyatt at the meeting on September 7, 1956, as testified to by him and as corroborated by Franklin Douglas McDaniel, who was one of Pinney's directors and their counsel and was called as a rebuttal witness by Pinney. The Court has caused a transcript of his testimony to be made, from which we quote the following:

"A. It seems to me that what struck me, what I recall most about it was after we had gone along somewhat in generalities, so far as I was concerned personally, Mr. Wyatt either asked or made a comment to the effect that—as to whether or not the *ownership of the business was going to change*. I forget who now asked as to what difference that made.

"He made the comment then, '*If there is any change in the dealership, ownership interest, we can't give you Plymouth,*' saying that to the three prospective purchasers. And Chuck was pretty upset. I mean he was sort of surprised, and wondered why that was.

"The Court: Did he say so?

"The Witness: Yes, He said, 'What is the point of all this?'

"The Court: All right.

"The Witness: Then as I recall, Wyatt explained that the company was embarked upon a policy of divorcing Plymouth from the other cars, *and that as long as an agency or franchise was in effect the dealer had a vested interest, you might say, or a contractual right to continue to sell Plymouth, but at such time as these franchises were terminated in various areas it was the company's policy, in giving a new franchise, to sort of skin off Plymouth here and there.*" (Emphasis added.)

So if this testimony is considered in conjunction with the circular of August 24, 1955, it is undeniably clear that knowledge of the new policy *was not* concealed from Pinney. On the contrary, they had knowledge of it through the circular and, when actual transfer was under discussion, its detailed terms and the reason for it were fully revealed at the meeting of September 7, 1956, when the "Burton-Battenfield-Measures" proposed transfer was discussed. Wyatt agreed to recommend to the then regional manager, Robert B. McCurry, the waiver of the condition. McCurry, in turn, agreed to recommend such waiver to the Chrysler main office in Detroit.

Much is made of the fact that McCurry does not remember the conversation, and that, in answer to plaintiff's interrogatories, Chrysler stated, in effect, that there were no *written records* to indicate that McCurry's recommendation was received or acted on by them. (Answers to Plaintiff's Interrogatories, No. 5, 17, 20.) But the fact remains that Wyatt, who in this case was called by Pinney as their own witness (*and not* as the agent of an adverse party),[15] testified positively that, after the discussion on September 7, 1956, at El Centro, at which he disclosed the policy of the company as to discontinuing dual dealerships, he first

urged them to accept a split dealership. When they declined to do so, he stated that he would recommend to McCurry that Chrysler make an exception. He added that he did so and that McCurry *informed him* later that he had communicated his recommendation to Chrysler's main office in Detroit, who rejected it. The Court has caused the reporter to transcribe a portion of Wyatt's testimony, from which we quote the following:

"Mr. Fain: Did you say anything to these gentlemen with reference to your personal attitude in respect to the continuation of the single or dual relationship? A. Well I made an effort to sell this group of people the idea of going into this on the basis of a Dodge and Dodge-Truck dealership, and I was unable to do so, and I thought enough of them that I agreed that I would recommend them and see if I could get the franchise for them on a Dodge-Plymouth basis, but I think I made the point clear that I could not offer that franchise. I did recommend it, and tried to get it, but that was the best I could do for them.

"Q. And did you recommend this position to the regional office? A. Yes I called Mr. McCurry and explained the problem that I had run into, and asked him if he would attempt to get it for me, and he agreed to do so, *and called me back I think later that day, possibly the next day, and explained that he had been unable to get an exception made in the case, and I would have to go back into the El Centro market on the basis of Dodge and Dodge Trucks.*

"Q. And I take it you communicated this decision to Messrs. Pinney and Topliff. A. That is correct." (Emphasis added.)

B. *The Testimony of Franklin Douglas McDaniel*

As already stated, one of the witnesses in rebuttal for Pinney was Mr. Franklin

---

15. Rule 43(b), Federal Rules of Civil Procedure.

Douglas McDaniel who was an officer in Pinney and also its counsel. We have already referred to some of his testimony. He attended the meeting on September 7, 1956, when the "Burton-Battenfield-Measures" proposal was discussed, at which Wyatt, Pinney and Topliff were present. After detailing the discussion about the single dealership, he testified very distinctly that *he telephoned McCurry after the meeting, on or about September 10, 1956, and discussed with him the exception desired to be made, and that he later received notice of rejection by the Chrysler main office.* We give this portion of the testimony as transcribed by the reporter:

"Q. Now, will you please tell the conversation you had with Mr. McCurry at that time? Incidentally, before you do that, how long in point of time was this telephone call to Mr. McCurry after this meeting that you just related as having taken place with Mr. Wyatt? A. As I recall, the meeting with the prospective purchasers and Mr. Wyatt was on a Friday evening and the telephone conversation with Mr. McCurry was probably on the following Tuesday. I can say that rather definitely it was on that Tuesday.

"Q. With that background, please state what the conversation was? A. I identified myself as a director of Pinney & Topliff and as an attorney in El Centro who had done work for Pinney & Topliff. I stated next that I had attended a meeting the previous Friday evening, which had been concerned with the objective of finding a buyer for the El Centro agency. We had learned at that meeting that if a new franchise was given to any purchaser that it would not include Plymouth, and that the decision as to whether or not an exception could be made was not up to Mr. Wyatt, as he had told us, but it was going to be up to people who were superior to him in the management of the corporation and

that *I was calling to attempt to, frankly, persuade him or sell him on the possibility of making an exception if he could make it, or to recommend it, if that was what he did.*

"And then I attempted to point out to him that Pinney & Topliff had always been an excellent producer for Chrysler and had a lot of goodwill in Imperial Valley, and they were *certainly entitled* for that reason, if no other, *to a little consideration.*

"Mr. McCurry wasn't too responsive at that point, and I took the tack then it would be unfortunate to allow the dealership to close right at the time their new model, which was reported to be a very good model, was about to come out. And that was about, you might say, the sum of my presentation.

"*Then he explained to me that there was some sort of a committee in Detroit which passed upon the matter of these franchises and particularly as to whether or not any of these exceptions were going to be made that we are discussing.*

"I said something about, '*Well, certainly there is no harm in asking. Can you ask them and give them the picture, as I have tried to relate it here, and with which I am sure you are familiar.*'

"I was finally very much pleased. He said, '*Yes, I will call Detroit and I will recommend the exception be made, and I will let Wyatt know.*'

"Q. Now, you positively recall that he stated he would call Detroit and recommend the acceptance. When you say 'acceptance' what are you talking about? A. Recommending the exception, the exception to the policy of allowing—or forcing Plymouth to be divorced from the Dodge agency.

"Q. Do you personally know whether McCurry contacted Detroit? A. I have no way of knowing.

"Q. Did he call you to advise you anything following this conversation? A. No, I didn't talk to Mr. McCurry again.

"Q. Did you hear from any representative from Wyatt regarding any decision? A. A telephone call came in to my office—I guess it must have been the next day—from Mr. Wyatt. I was not there, but I was informed by the secretary that Mr. Wyatt had called and said that the deal was—could not be made, that is, there would be no exception allowed.

"Q. This came in from Mr. Wyatt, is that right? A. Yes, sir." (Emphasis added.)

It is evident, therefore, that whether any contemporaneous written memorials exist of the communication to the main office of the recommendation for exception or not, the fact remains that one of Pinney's directors and their counsel testified, as did Wyatt, that the exception was (a) requested, (b) that it was communicated to Chrysler in Detroit, (c) rejected by them, and (d) such rejection communicated by Wyatt to Pinney through McDaniel.

## IV

### Conclusions and Inferences on the Facts

So the upshot of the matter is this: At most Chrysler's district and regional managers agreed to recommend the acceptance of a satisfactory buyer by Chrysler when one was found. They sought such buyers, as did Pinney. In their answers to interrogatories, Chrysler listed at least eight prospective buyers, in addition to the "Burton-Battenfield-Measures" group who were "contacted" for the dealership "either on Chrysler's own initiative or by reference from Pinney & Topliff". (Answer to Plaintiff's Interrogatory No. 8.) When a "promising" one was found, they recommended to the Chrysler main office approval of the transfer of the dealership with the waiver of the requirement as to single dealership. As was their right, Chrysler did not consent to the waiver.

So the deal fell through, because the prospective buyers would not accept a single dealership. Thereafter, Pinney, by letter dated October 8, 1956, voluntarily terminated the dealership under the ninety-day clause in the Contract of August 20, 1952. This they had a right to do.

It is to be noted that prior to this date meetings of the directors and shareholders of the plaintiff corporation were held on September 19, 1956, at which Resolutions were adopted to dissolve the corporation. The directors' Resolution also authorized the immediate payment of $10,000 in corporate funds to Charles A. Pinney, Jr., on account of his distributive share of the assets, in accordance with an agreement of the same date entered into by him and Topliff. Under this agreement Topliff was to draw from the corporate funds $500 a month during the liquidation. As Pinney owned 75 per cent of the stock and the company was solvent and had assets, under other circumstances the advance to Pinney would be an unimportant event. But the circumstances under which it was made, and the fact that even while in law school Pinney, as President, drew a salary of $900 a month, lend support to the conclusion that the determination to liquidate the business, in some manner, was not brought about by any unfulfilled promises of Chrysler's but by the conditions which confronted the Pinney corporation. Although the meeting was held after the abandonment of the "Burton-Battenfield-Measures" deal, the minutes do not reflect any statement by anyone attributing the desire to dissolve to any alleged failure on the part of Chrysler to assist in the disposal of the agency as a going business. So, in answer to the questions propounded at the beginning of the opinion, I find:

(1) Chrysler did not promise or represent to Pinney that if they would continue operations they would procure a buyer within a reasonable or definite time, or at all. Whatever promises were made as to assistance in disposition of the dealership were intended to be per-

formed and were actually performed by Chrysler's agents;

(2) Pinney did not rely on any such representations. To the contrary, they continued efforts to conduct the business in the absence of their President. They attempted to reorganize their management and they themselves interested persons who might purchase the business. So there was no such change of position to their detriment as is necessary to warrant a finding of constructive fraud [16] or to give rise to a promissory estoppel, even if the representations had been made.[17] However, I am also of the view that:

(3) Chrysler did not (a) make any promises or representations without intention of performing them or knowing them to be untrue or having no basis for believing them to be true, (b) or suppress any material facts which suppression was likely to mislead or (c) misled or took advantage of Pinney in breach of a duty imposed by the relationship of the parties.[18]

In sum, I find that there was no actual or constructive fraud or deceit committed by Chrysler, as these terms are understood in California law. I am also of the view that the claims under State law are barred by the three-year statute of limitations.[19] And that Pinney has not shown any concealment on the part of Chrysler which excused delay in discovery, or any acts by Chrysler "lulling" them into a sense of security, which excused the failure to act.[20]

## V

## The Claim Under the Automobile Dealers Act

What has just been said disposes also of the asserted claim under what is known as the Automobile Dealers Act.[21] This act, which creates a right of action where none existed at common law, is what is known as a "statute of creation". For this reason, the limitations as to the conditions of recovery and the remedy are to be treated as "limitations of the right".[22]

The object of the statute was to give a right of action to automobile dealers when the automobile company fails to act in good faith

"in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer."[23]

However, the term "good faith" merely means the duty to act

"in a fair and equitable manner towards each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party."[24]

The right of recovery depends upon the existence of such acts.[25]

I find that there was no coercion, intimidation or threat of coercion or intimidation in the case on the part of Chrysler. As amply appears from the discussion of the facts which precedes,

16. California Civil Code, § 1709.

17. Restatement, Contracts, § 90: Bard v. Kent, 1942, 19 Cal.2d 449, 452-453, 122 P.2d 8, 139 A.L.R. 1032; Edmonds v. County of Los Angeles, 1953, 40 Cal. 2d 642, 653, 255 P.2d 772; Drennan v. Star Paving Company, 1958, 51 Cal.2d 409, 412, 333 P.2d 757; West v. Hunt Foods, Inc., 1951, 101 Cal.App.2d 597, 605, 225 P.2d 978; Hunter v. Sparling, 1948. 87 Cal.App.2d 711, 725-726, 197 P.2d 807.

18. California Civil Code, §§ 1571, 1573, 1710.

19. California Code of Civil Procedure, § 338(4).

20. Noll v. Baida, 1927, 202 Cal. 98, 106-109, 259 P. 433; Bainbridge v. Stoner, 1940, 16 Cal.2d 423, 430, 106 P.2d 423; Hobart v. Hobart Estate Co., 1945, 26 Cal.2d 412, 437-439, 159 P.2d 958; Sidebotham v. Robison, 9 Cir., 1954, 216 F. 2d 816, 823-824.

21. 15 U.S.C.A. § 1221 et seq.

22. See the writer's opinion in Adams v. Albany, D.C.1948, 80 F.Supp. 876, 880.

23. 15 U.S.C.A. § 1222.

24. 15 U.S.C.A. § 1221(e).

25. See Staten Island Motors, Inc. v. American Motors Sales Corp., D.C.N.J. 1959, 169 F.Supp. 378, 382.

the desire to terminate the agency, either by sale or otherwise, originated with Pinney who were dissatisfied with the arrangement first in 1954 and whose President and controlling stockholder, in 1955, determined to enter law school, an act in which he was not encouraged by the representatives of Chrysler, who, on the contrary, advised against it. The final notice of termination was given by Pinney on October 8, 1956.

At no time did Pinney tell any of the district or regional managers of Chrysler that *if a buyer was not secured at a definite time they would terminate the dealership or liquidate.* So, even assuming that an automobile company might "force" a termination by a dealer under circumstances which would warrant a court in concluding that although the termination was, *in appearance,* a voluntary one on the part of the dealer, *in reality,* it was coerced by the automobile company, this is not the situation before us. Chrysler's representatives tried to assist in disposing of the business. After Pinney's President was admitted to law school he decided to remain there, sought to reorganize the management of the business and chose to run it at a loss rather than return to its management. He, no doubt, believed that he could run it *in absentia.* For he drew a salary while at law school. The termination was Pinney's voluntary act, not forced by any coercion or intimidation by Chrysler.

Consequently, the conditions for the application of this salutary statute do not exist in this case. In addition to this, there is absent another condition for the application of the Act: There was no promise or representation made or consequent loss or damage incurred subsequent to the effective date of the Act. And the statute restricts recovery to the damages sustained by the dealer by reason of the failure of the automobile manufacturer to act in good faith "from and after August 8, 1956".[26] For the same reason, the claim is also barred by the three-year limitation in the statute.[27]

To conclude: Pinney is seeking to recover, in tort, for a voluntary act on their own part which ultimately resulted in the liquidation of their automobile agency. The Civil Code of California declares: "He who consents to an act is not wronged by it."[28] This is a codification of the maxim *volenti non fit injuria,* which is a basic tenet of our jurisprudence. It precludes the maintenance of an action for a wrong by one who has " 'consented to the act which has occasioned his loss' ".[29] Its application to the facts in this case would, of itself, call for denial of recovery.[30] However, the prior discussion sets forth other grounds, legal and factual, for the conclusion that there is no legal liability on the part of Chrysler for any of the acts complained of.[31]

Judgment will, therefore, be for the defendant on the issue of liability, that it is not liable to the plaintiff under any of the remaining causes of action, 1, 2 or 4.[32] The Third cause of action has already been dismissed and judgment of dismissal ordered entered. Findings and Judgment, in accordance with the views expressed herein, to be prepared by counsel for the defendant under Local Rule 7, West's Ann.Cal.Code. Costs to the defendant. No attorneys' fees.

26. 15 U.S.C.A. § 1222.

27. 15 U.S.C.A. § 1223.

28. California Civil Code, § 3515.

29. Edward Brown & Sons v. City and County of San Francisco, 1950, 36 Cal. 2d 272, 279, 223 P.2d 231, 235.

30. 92 C.J.S., pp. 1027–1028; Restatement, Torts, § 892; Surface v. Safeway Stores, Inc., 8 Cir., 1948, 169 F.2d 937, 942.

31. In view of the conclusion reached that, under the facts, no claim has been proved under the Automobile Dealers Act (15 U.S.C.A. § 1221) it is unnecessary to pass upon the constitutionality of the Act which has been challenged by the defendant.

32. Rule 42(b), Federal Rules of Civil Procedure.